Patricia J. CHALFANT, Appellant,

v.

The WILMINGTON INSTITUTE, a corporation of the State of Delaware, Jack W. Bryant and Edward B. duPont.

No. 76–2132.

United States Court of Appeals, Third Circuit.

Argued April 1, 1977.

Reargued en banc Nov. 7, 1977.

Decided Feb. 27, 1978.

Alfred J. Lindh, Bayard J. Snyder, Wilmington, Del., for appellant.

F. Alton Tybout, John A. Elzufon, Wilmington, Del., for appellee, The Wilmington Institute.

Henry N. Herndon, Jr., Morris, James, Hitchens & Williams, Wilmington, Del., for appellees, Wilmington Institute, Jack W. Bryant and Edward B. duPont.

Before SEITZ, Chief Judge, and VAN DUSEN, ALDISERT, ADAMS, GIBBONS, ROSENN, HUNTER, WEIS, GARTH and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

This appeal grows out of a dispute following the discharge of an employee by the public library system of the City of Wilmington and County of New Castle, Delaware. After a bench trial, the district court dismissed the complaint on the ground that the termination did not involve state action within the reach of the fourteenth amendment. The court also declined to adjudicate pendent state law liberty and defamation claims.[1] We reverse the district court's state action holding. Since that reversal will require findings of fact on the merits of the wrongful discharge claim, which, according to the appellant, is closely related to the pendent state law claims, we vacate the dismissal of those claims so that the district court may reconsider whether those claims should be adjudicated with the discharge claim.

### I.

It is not surprising that in a constitutional democracy such as ours one of the functions which was first recognized as the responsibility of government was that of assuring an informed citizenry through the maintenance of public libraries. In some states this recognition antedated the emergence both of free public schools and of municipal police departments.[2] Govern-

---

1. Trivits v. Wilmington Inst., 417 F.Supp. 160 (D.Del.1976). During the trial stages of this litigation, plaintiff's name appeared as Patricia J. Chalfant Trivits. She is referred to in the papers on appeal, and herein, as Chalfant.

2. Public libraries were recognized as governmental responsibilities as early as 1810. See J.

Shera, Foundation of the Public Library 158–99 (1949). See also C. Joeckel, The Government of the American Public Library 1–31 (1935). American cities were accepting gifts for the founding of public libraries in the seventeenth and eighteenth centuries. See A. Schlesinger, Birth of a Nation 113, 169 (1969). The development of organized municipal police forces did

mental assumption of the responsibility for providing public library services occurred earlier in some states than in Delaware. Nevertheless, the public library system of New Castle County and of the City of Wilmington, which is located in that county, eventually emerged. That system is described in the Introduction to Exhibit PX 35, the Staff Handbook of the Wilmington Institute and New Castle County Libraries, as follows:

> The Wilmington Institute Free Library and the New Castle County Free Library are two arms of a single public library system serving all of the people of New Castle County. The two libraries are governed by a single Board of Managers and administered by a single Director of Libraries. For Staff Members, as for the public who use the libraries, the only distinction between the two is the geographic location of the service agency in which a staff member performs his or her duties. All policies are the same for the entire system. Except as limited by the physical facilities and operating needs of each agency or department, practices and procedures are uniform.

> The New Castle County Free Library is supported largely by appropriation by the New Castle County Council and provides all services outside the City of Wilmington. This library was established in 1927 by a gift from Miss Alice P. Smyth as a Memorial to Miss Mary H. Askew-Mather. From its early beginnings as a service to rural communities it has developed into a major series of library agencies, with two branches, two mobile branches and numerous special and institutional services.

> The Wilmington Institute Free Library receives the bulk of its support from the City Council of Wilmington and, in addition to the services of the Central Library, operates two branches and special and institutional services. This library

traces its beginnings to a private subscription library founded in 1788 which subsequently joined with other organizations and became The Wilmington Institute in 1859. It remained a privately supported library until 1893 when, through the generosity of William P. Bancroft, it became the Free Library for the city of Wilmington.

> The Board of Managers of The Wilmington Institute functions as the governing body of the libraries. It consists of ten members who are self-perpetuating and eight members who serve *ex officio* because of other positions they hold. These are the Mayor of Wilmington, the President of the Wilmington City Council, three members of the Finance Committee, the President of the Wilmington Board of Education, the Wilmington Superintendent of Schools and the County Executive of New Castle County.

> This Board establishes all libraries policies and appoints the Director of Libraries who is responsible for the execution of policies established by the Board and for the administration of the libraries. Staff members are appointed by the Director with the concurrence of the Board.

> The members of the Board of Managers donate their time and energies to the library as a community service. *The Director and all staff members are paid public servants.*

(emphasis supplied).

One of those public servants, Chalfant, the appellant herein, was initially employed by the Wilmington Institute in September, 1968, as a library trainee. Two years later she had advanced through a number of intermediate grades to the position of Chief of the Book Processing Department of the Institute. On February 16, 1972, she was discharged. Subsequently, she brought this suit against the Wilmington Institute and two of its officers, Jack W. Bryant and Edward B. duPont.

---

not begin on a large scale until the 1840's. *See* J. Richardson, Urban Police in the United States 22–28 (1974). The movement toward universal free public education is usually measured from the enactment in 1827 in Massachu-

setts of a statute under which Horace Mann became Secretary of a State Board of Education, although prior to 1827 states did provide education for paupers. *See* H. Good, A History of American Education 159–62 (2d ed. 1962).

In her amended and supplemental complaint Chalfant contended that her discharge violated her substantive and procedural rights guaranteed by the fourteenth amendment and thus violated 42 U.S.C. § 1983. Specifically, she alleged: (1) that she had been deprived of a property right (her employment) without due process of law; (2) that she had been discharged because of her sex in violation of the equal protection clause; and (3) that certain letters written by the defendants had damaged her reputation and thereby had deprived her of liberty and property in violation of due process. Chalfant also contended that the termination of her employment was maliciously motivated and that the letters previously mentioned, which were circulated to New Castle officials and to the American Library Association, defamed her as a matter of state tort law. On July 22, 1975, the district court entered a pre-trial order which established certain admitted facts.[3] On July 30, 1975, trial of this action commenced. At the end of the plaintiff's case, the defendants moved to dismiss the action pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. Since it found no evidence of sex discrimination, the district court granted this motion with respect to that part of plaintiff's complaint alleging sex discrimination.[4] The court reserved decision on this motion with regard to the remaining allegations in Chalfant's complaint. At the close of the entire case, following post-trial briefing, the court concluded that Chalfant's termination did not involve the requisite state action for a § 1983 claim and thus it dismissed the complaint. Most of the historical or narrative facts upon which the court predicated its legal conclusion that state action was lacking are not disputed in any material respect. Consequently, without repeating them here, we incorporate by reference those findings as they appear in the district court's reported opinion.[5]

There is additional, undisputed evidence in the record which is relevant to the governmental status of the Wilmington Institute, but which the district court, in its opinion below, did not specifically mention. For example, Docket Item 31[6] contains

---

3. 3. ADMITTED FACTS:

3–1. The Wilmington Institute, hereinafter called the "Institute", is a Delaware corporation which owns and operates a free library, called the "City Library" in the city of Wilmington and administers a library system in New Castle County known as the "New Castle County Free Library".

3–2. The Institute enjoys a legislative exemption from county and municipal real estate taxes under 9 Del.C. § 8105.

3–3. New Castle County has made appropriations pursuant to 9 Del.C. § 1562 for the support of the New Castle County Free Library operated by the Institute.

3–4. The Institute is governed by a self-perpetuating Board of Managers which includes non-voting members as ex officio representatives of Wilmington and New Castle County.

3–5. Defendant Jack W. Bryant was, at all relevant times, the Director of Libraries for the Institute and, as such, was the chief executive officer of the Institute and was also Secretary of the Board of Managers.

3–6. Defendant Edward B. duPont is President of the Board of Managers.

3–7. Plaintiff was employed on September 30, 1968 by the Institute as library trainee. She became a "beginning librarian" on December 11, 1968; a Librarian II on August 1, 1969; a Librarian III, in which rank she was acting chief of technical processing on January 21, 1970; and on September 8, 1970, chief of technical processing.

3–8. Plaintiff requested and received a hearing before a special committee of the Board of Managers.

3–9. Plaintiff was hired at a salary of $5,966.00 effective September 30, 1968 and reached a salary level of $10,675.00 on November 15, 1971, which was her final salary level. (Defendants' answers to interrogatories, 12.)

4. Chalfant's original complaint had also alleged that she had been discriminated against on the basis of her sex in violation of Title VII of the Equal Employment Opportunity Act, 42 U.S.C. § 2000e–2(a)(1). The district court dismissed this claim prior to trial on the ground that Chalfant had failed to seek administrative remedies prior to filing the civil suit. Trivits v. Wilmington Inst., 383 F.Supp. 457, 460 (D.Del. 1974).

5. 417 F.Supp. at 163–65.

6. Docket Item No. 31 was relied upon by the district court in making its findings of fact. Although this docket item was not marked in evidence, neither the appellant nor the appellees have contended that it should not have been considered.

plaintiff's Interrogatory No. 4 and defendants' answer thereto:

4. State whether the "Wilmington Institute and New Castle County Free Libraries" referred to [in] paragraph 5 of the Answer in this action is a corporate entity and, if so, identify its date and place of incorporation, the date and place of filing of the Certificate of Incorporation or Charter and identify the public record of its filing by the appropriate index or docket references.

ANSWER: The "Wilmington Institute and New Castle County Free Library" is not a corporate entity. It is a management title under which City and County libraries are operated.

Also in evidence are Exhibits PX 36 and PX 37, which are agreements between New Castle County and Wilmington Institute providing for the administration by the Institute of federal funds received by the county pursuant to Title I of the State and Local Fiscal Assistance Act of 1972, Pub.L. No. 92–512, codified in 31 U.S.C. §§ 1221 *et seq.* Two clauses of these agreements, which are quoted in the margin,[7] provide in detail for the fulfillment of the county's fourteenth amendment obligations. Under this federal revenue-sharing statute, the federal government provides to state and local governments specified portions of federal individual income tax collections to be used by such governments for governmental purposes. In the fiscal year ending June 30, 1974, the Wilmington Institute received $481,581.00 in such federal revenue-sharing funds. In the following year the federal government's support from income tax revenues rose to $514,000.00. The agreements require a monthly report to the county of expenditures, of persons served, and of the nature of the services rendered. The Institute's records are subject to audit by the county as well as by the auditors of the United States Treasury Department. Although, because federal funds only became available in 1973, Exhibits PX 36 and PX 37 were not in effect when Chalfant was discharged, they do show the nature of the relationship between the county government and the public library, a relationship which antedated federal funding. The county government's interest in the personnel policies of the Institute is demonstrated in PX 19, a letter from William J. Conner, County Executive and exofficio board member, dealing with Chalfant's discharge:

March 8, 1972

Mr. Jack Bryant
Director of Libraries
Wilmington Institute Free Library
Tenth and Market Streets
Wilmington, Delaware

7. 7. *Specific Discriminatory Actions Prohibited*—The Agency will not, on the grounds of race, color, national origin or sex:

a. Deny any service or other benefit provided under the program or activity.

b. Provide any service or other benefit which is different, or is provided in a different form from that provided to others under the program or activity.

c. Subject to segregated or separate treatment in any facility in, or in any matter or process related to receipt of any service or benefit under the program or activity.

d. Restrict in any way the enjoyment of any advantage or privilege enjoyed by others receiving any service or benefit under the program or activity.

e. Treat an individual differently from others in determining whether he satisfies any admission, enrollment, eligibility, membership, or other requirement or condition which individuals must meet in order to be provided any service or other benefit provided under the program or activity.

f. Deny an opportunity to participate in a program or activity as an employee.

g. Utilize criteria or methods of administration which have the effect of subjecting individuals to discrimination on the basis of race, color, national origin or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity with respect to individuals of a particular race, color, national origin or sex.

8. *Other Discriminatory Actions*—The Agency, in determining the site or location of facilities, will not make selections of such site or location which have the effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination on the grounds of race, color, national origin, or sex, from the benefits of an activity or program; or which have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the State and Local Fiscal Assistance Act of 1972.

Dear Mr. Bryant:

I understand that the Board of Wilmington Free Institute is conducting a hearing this morning to consider a complaint by Mrs. Trivits with respect to her discharge.

I would like you to convey to the members of the Board the fact that this matter has come to the attention of two members of County Council who have indicated to me their serious concern with possible inequities in this matter. They have asked me to keep them advised as to how the matter develops. I thought the Board would wish to know that this matter is of serious concern to the County government. I would appreciate being kept advised of the outcome.

Respectfully yours,

William J. Conner
County Executive

WJC/smc

In concluding that the Wilmington Institute was not engaging in state action when it terminated Chalfant's employment, the district court placed primary emphasis on two factors. First, the court noted that under applicable Delaware statutes the Institute's Board of Managers was, except for ex officio officials of the City of Wilmington and New Castle County, self-perpetuating. Next, the court observed that the actions which resulted in Chalfant's termination were taken not by the ex officio public members of the Board of Managers, but by two of the self-perpetuating and, from the district court's perspective, private members. *See* 417 F.Supp. at 164–66. The court stated that in order to find state action for purposes of the fourteenth amendment, the Supreme Court's decision in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 447 (1972), requires a nexus between the governmental involvement and the challenged activity. Since the members of the Board of Managers who acted in discharging Chalfant were, according to the court, private, the court concluded that no such nexus existed.

There are several difficulties with this analysis. First, the district court's analysis assumed that *Jackson v. Metropolitan Edison Co.* has substituted for the former state-action tests, which varied according to the context in which the issue arose, a unitary nexus test for all purposes. In *Hollenbaugh v. Carnegie Free Library,* 545 F.2d 382, 383 (3d Cir. 1976), in a context indistinguishable from the present, we expressly rejected that interpretation of *Jackson.* Writing for the panel, Judge Aldisert said:

As we observed in *Magill* [*v. Avonworth Baseball Conference,* 516 F.2d 1328 (3d Cir. 1975)], the Supreme Court has not fashioned "any definitive state action formula"; rather, the Court "admits to extreme difficulty in articulating an all-inclusive test and seems to emphasize that, within the confines of certain guidelines, the presence or absence of state action must be determined on a case-by-case basis." 516 F.2d at 1332 (footnotes omitted).

In *Braden v. University of Pittsburgh,* 552 F.2d 948, 957 (3d Cir. 1977) (en banc), we reiterated the *Hollenbaugh* holding that *Jackson* had not substituted a single nexus test for an ad hoc analysis of the facts and circumstances of each case as it arises. *Braden* also recognized explicitly that *Jackson* did not overrule *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). In dealing with *Burton,* Judge Adams, writing for this court in *Braden,* observed:

Speaking for a unanimous panel [in *Hollenbaugh v. Carnegie Free Library*], Judge Aldisert declared: "The state's extensive participation in the comprehensive program may obviate a need to show involvement in the specific activity challenged [as] is illustrated by *Burton* . . . ."

552 F.2d at 958 n. 45.[8] Thus, the law in this circuit is clear. The *Jackson* nexus test,

---

8. The court's opinion in *Braden* also drew support from then District Judge Higginbotham's decision in *Isaacs v. Board of Trustees of Tem-* *ple University,* 385 F.Supp. 473 (E.D.Pa.1974). 552 F.2d at 962–63. Although *Isaacs* was decided before the Supreme Court's decision in

whatever it means in the context of the activities of what the Supreme Court considers to be private enterprises, cannot be applied mechanically in other contexts. We have expressly rejected the application of the *Jackson* test, which was enunciated within the context of a private enterprise electric utility, to the analysis of state action in a public library, a university, or any other public educational institution. *Hollenbaugh* and *Braden* hold that the status of the individual actor is irrelevant if the institution on whose behalf he acted is found, upon an examination of all the relevant factors, to be an instrumentality of a state or local government.[9]

█ Compared to *Hollenbaugh,* this is an a fortiori case. As in *Hollenbaugh,* Chalfant's public library employer derives over 90 per cent of its revenues from tax sources. As in *Hollenbaugh,* the local governments which furnish revenue from tax sources are represented on the library's governing board by ex officio members holding public offices. As in *Hollenbaugh,* the library enjoys tax exempt status. As in *Hollenbaugh,* contracts designate the employer as an agent of the government in furnishing public library services to the public. The only relevant factual distinction between this case and *Hollenbaugh* is the absence of a *specific* tax earmarked for support of the library. But in place of a specific tax, the state legislature has by legislation decided the level of appropriations from general tax revenues for library services. Thus, both here and in *Hollenbaugh,* state law defines the level of library services. Moreover, the record here discloses much greater public involvement. Even the structure, organization, and management of the Board of Managers is mandat-

ed by state legislation. 19 Del.Laws chs. 734 and 983. And unlike *Hollenbaugh,* the main library of the Wilmington Institute is situated on *city-owned* property under a *rent-free* lease. That lease is perpetual, provided that the library continues to furnish library services. All of these facts and circumstances convince us that the Wilmington Institute is an instrumentality of state and local government.

Moreover, the Institute's tenancy in a city-owned building under a rent-free lease brings this case squarely within even the narrowest reading of *Burton v. Wilmington Parking Authority, supra.* The landlord here is the same City of Wilmington which leased the restaurant space in *Burton.* *Burton* involved an ordinary commercial lease. It was not contended there that the city had any interest, other than in revenue, in providing restaurant services. Nevertheless, the Supreme Court held that under the circumstances there the city could not permit its tenant to violate the dictates of the fourteenth amendment. Here the city's interest in the function being performed is far greater. Concededly, the city has no interest in the tenant's revenues. Indeed, the city itself provides nearly half of those revenues; the city and county together provide over 90 per cent. The city's interest lies in the governmental function of educating the public by providing, on premises it owns and with funds which it raises by taxation, a public library. Since the city and county are principals in that enterprise, the activities of the enterprise themselves are governmental. Moreover, since this case meets the state involvement test of *Burton, Hollenbaugh,* and *Braden,* the district court erred in looking for a *Jackson-*type nexus between the challenged activity

---

*Jackson,* the *Braden* court observed that the reasoning employed in *Isaacs* was still valid.

**9.** In *Parks v. "Mr. Ford",* 556 F.2d 132, 151–57 (3d Cir. 1977) (Gibbons, J., concurring), I attempted to convince my colleagues that a different analysis is required when the state acts in a variety of roles—as a principal in an enterprise, as a delegator of functions, as a coercer, as a sanctioner, as a facilitator of private transactions, and as a law giver. Chief Judge Seitz

and Judge Aldisert joined in that part of my opinion, 556 F.2d at 165, and Judge Adams, writing separately, expressed substantial agreement, *id.* at 143–44. Although I still adhere to those views, my efforts to categorize the varying aspects of state action did not commend itself to a majority of this court, perhaps because no all-inclusive system of classification will be a completely satisfactory solution of the multifaceted state-action problem.

and the state involvement. Only if no state involvement is found under *Burton* should the district court then search for state action under the *Jackson* test.

■ Another difficulty with district court's analysis is that, even disregarding *Burton, Hollenbaugh,* and *Braden,* the court misapplied the Supreme Court's holding in *Jackson. Jackson* involved· a private enterprise public utility company. Starting from the premise that the creation and maintenance of an energy distribution network is a function for private business rather than for government, Justice Rehnquist's opinion for the Court stated that, in order to determine whether the activities of the agents of that private business constitute state action, a court must examine "whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." 419 U.S. at 351, 95 S.Ct. at 453. But the district court in the instant case omitted any meaningful inquiry into the existence of the premise which would justify the application of the *Jackson* nexus standard. Instead of determining, first, whether the employer was governmental or private and, if private, then applying the nexus test to determine if nonetheless its agents were engaged in state action, the district court applied the nexus test to answer the first question. The chief ground on which the district court relied in holding that state action was absent was that Chalfant's employment termination was accomplished by those· members of the Board of Governors who are self-perpetuating under the applicable Delaware legislation. Thus, the court looked at the status of the agent to determine the nature of the principal. But the Supreme Court never intended the nexus test to be put to such a use. If that were the test, then any state could avoid the reach of the fourteenth amendment over any governmental function merely by turning over the administration of that function to a self-perpetuating board. The self-perpetuating method of selecting some members of boards of managers of public libraries, public schools, public universities,

or even police departments cannot serve to make the board members' actions any less governmental than if under applicable statutes they had been elected. Otherwise, the door would be open, particularly in education, for the wholesale evasion of fourteenth amendment substantive requirements, including the requirement of school desegregation. *See Griffin v. County School Bd.,* 377 U.S. 218, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964).

■ Nor can evasions of state governmental responsibilities be permitted to turn on the fact that the instrumentality to whom the responsibility has been delegated once operated, in the dim and distant past, as a private institution. *See Commonwealth of Pennsylvania v. Brown,* 392 F.2d 120 (3d Cir.), *cert. denied,* 391 U.S. 921, 88 S.Ct. 1811, 20 L.Ed.2d 657 (1968); *Kerr v. Enoch Pratt Free Library,* 149 F.2d 212 (4th Cir.), *cert. denied,* 326 U.S. 721, 66 S.Ct. 26, 90 L.Ed. 427 (1945). In *Enoch Pratt Free Library,* the Fourth Circuit, dealing with a public library whose history was not dissimilar to that of the Wilmington Institute, stated the issue nicely:

It would be conceded that if the state legislature should now set up and maintain a public library and should entrust its operation to a self perpetuating board of trustees and authorize it to exclude Negroes from its benefits, the act would be unconstitutional. How then can the well known policy of the Library, so long continued and now formally expressed in the resolution of the Board, be justified as solely the act of a private organization when the state, through the municipality, continues to supply it with the means of existence.

149 F.2d at 219. The *Enoch Pratt Free Public Library* case was decided in 1945. The result would not be any different today. The Wilmington Public Library is a state instrumentality. It and its agents were engaged in state action when they terminated Chalfant's employment. Therefore the judgment dismissing Chalfant's § 1983 claim must be reversed.

## II.

Chalfant's pendent state law claims are based upon two incidents of alleged defamation. The first of these incidents is appellee Bryant's reply to William Conner's inquiry concerning Chalfant's discharge. That reply enclosed a copy of a letter from appellee duPont outlining the reasons why two members of the Board of Managers, acting as a special committee, upheld the dismissal. The second incident is a letter written by duPont to the American Libraries Association in response to that association's report on an investigation by its Staff Committee on Mediation, Arbitration, and Inquiry into the reasons for Chalfant's dismissal. The district court, while speculating that the state law claims were so unrelated to the § 1983 claims as to be outside the reach of pendent federal jurisdiction, exercised its discretionary power to decline to hear the pendent state law claims. In doing so, it relied primarily on Chalfant's perceived inability to establish a federal claim. Since that inability arose from the court's erroneous decision on the state-action issue, the court should be free to reconsider the exercise of its discretion to hear the pendent state law claims in light of the necessity for a decision on the merits of the § 1983 cause of action. Nothing in our decision in *Philadelphia Anti-Poverty Action Comm'n (PAAC) v. Rizzo*, 502 F.2d 306 (3d Cir. 1974), *cert. denied*, 419 U.S. 1108, 95 S.Ct. 780, 42 L.Ed.2d 804 (1975), precludes the exercise of pendent jurisdiction over the state law claims asserted here if the district court should choose to exercise such discretionary jurisdiction.

## III.

The judgment dismissing the appellant's § 1983 claim for lack of state action will be reversed and the case remanded for a deci-

sion on the merits of that claim. The judgment dismissing the pendent state law claims will be vacated and the case remanded for reconsideration of the exercise of pendent jurisdiction.

GARTH, Circuit Judge, with whom VAN DUSEN, Circuit Judge, joins, dissenting:

The majority opinion has wholly ignored the district court's findings of fact which establish beyond peradventure that the discharge of the plaintiff did not involve state action. Embarking on its own fact finding excursion, the majority of this court has sifted and weighed the evidence and has acted not as a reviewing authority but rather as an initial fact finder in seeking to support what I regard as an unwarranted conclusion—that state action exists. Primarily because the majority has transgressed its fundamental function as an appellate court, I am obliged to dissent.

That I differ somewhat from the majority in my reading of the applicable law is secondary in my view to the disregard shown by the majority for its proper function. It is clear to me as it should be to any appellate court that the facts found here by the district court, being fully supported by the evidence and therefore unassailable, make this a far different case than *Hollenbaugh v. Carnegie Free Library*, 545 F.2d 382 (3d Cir. 1976). I would affirm the district court based upon its findings of fact which, being supported by evidence, cannot be deemed clearly erroneous, *Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir. 1972)—the appropriate standard of review to which the majority has assiduously avoided addressing itself.[1]

### I.

After a four-day bench trial the district court found the following facts concerning

1. While the majority opinion recites that it "incorporates" the district court's fact finding in its discussion, Maj. Op. at 742, it appears strange to me that the very foundation of the district court's decision—its detailed fact finding—is not repeated *in haec verba* by the majority. This omission becomes even more curious when the majority opinion reprints verba-

tim a portion of the *pretrial order*, Maj. Op. at 741, but completely ignores the *trial* findings which are a product of *all* the evidence, including the facts admitted in the pretrial order. To supply this deficiency I have taken the liberty of setting forth the district court's findings of fact in the text of this dissent.

the relationship of the City of Wilmington to the Wilmington Institute, and to Chalfant's firing in particular. So that the fact findings of the district court are fully set forth I have included the relevant footnotes to which the district court's text refers.

In 1857 the "Young Men's Association for Mutual Improvement of the City of Wilmington" received a corporate charter for the maintenance of a private subscription library (11 Del. Laws, Chap. 344); in 1859 the name of the private corporation was changed to "The Wilmington Institute" (11 Del. Laws, Chap. 516). After the passage of 19 Del. Laws, Chaps. 734, and 983 (1893), the Institute became a free public library "opened to the use of citizens of Wilmington," forfeiting its status as a private subscription library in exchange for an exemption from property taxes [7] and annual appropriations from the City of five thousand dollars plus additional sums computed according to a formula based on the City's population. A further provision of the 1893 law required that the Mayor and five other City officials were to become *ex officio* members of the Institute's Board of Managers. However, the final section of this legislation expressly provided:

> "That the managers of the said institute shall have power to make by-laws and rules for the government of the library and reading rooms."

[7] This exemption is today codified in 9 Del.C. § 8104, and is enjoyed by over seventy-five other organizations.

Twenty-eight years later [8] in 1921, pursuant to yet another statute, the Institute

[8] Between 1893 and 1921 the following legislation pertaining to the Institute was enacted. 22 Del.Laws, Chap. 360 (1905) authorized the City of Wilmington to contract with the Institute to provide unlimited annual appropriations; 25 Del.Laws, Chap. 105 (1909) raised the minimum annual appropriation which the City was required to provide the Institute.

agreed to transfer a tract of land having a value in excess of $200,000 located in downtown Wilmington to the City of Wilmington in exchange for $200,000, which it was then to combine with its privately endowed building fund of $300,000 in order to finance the construction of its main library. Under the terms of this statute (32 Del.Laws, Chap. 109), the Institute was authorized to retain possession of the land and main library building so long as a free public library was maintained on the premises.[9] The library

[9] Companion legislation (32 Del.Laws, Chap. 110) expanded the number of City officials who were to serve *ex officio* on the Board of Managers from 5 to 8 specifying, however, that 10 other persons were to be elected to the Board of Managers by the stockholders of the Institute.

property was finally deeded in fee to the City on March 23, 1923 and the City in return granted a perpetual lease of the building back to the Institute with the right of management being held by the Institute. (Docket Item 31, par. 2). At about the same time the City also by indenture recognized that ownership of all books and documents housed in the library belonged to the Institute. (Docket Item 31, par. 29).

While the Institute's library service obligations to the public expanded between 1920 and the early 1970's through the influx of greater amounts of public funding, first from the City and then from the County, the active management of the Institute's operations was retained by the self-perpetuating Board of Managers, a majority of whom were and are private citizens.[13] Henry R. Folsom, Jr., County

[13] The Board of Managers consists of ten self-perpetuating non-governmental members and eight *ex officio* governmental members.

Councilman from 1967 until 1973 and President of County Council at the time of trial (Tr. 288–9), testified that during these years at "budget time," the County Council would invariably ask the Institute for some explanation as to whether the funds slated for appropriation were to be used for the purchase of books or for salaries. (Tr. 292, 303). He also testified that the County Council did not attempt to control the expenditure of the funds thus appropriated (Tr. 301–2),[14] and

[14] Beginning with fiscal year 1973 (July 1, 1973–June 30, 1974), the Institute and New Castle County entered into a formal written agreement (PX 36) breaking down into nine discrete categories the uses to which the money appropriated b the County was to be put. The agreement refers to the fact that the County was slated to receive federal "entitlement funds" under the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. § 1221 et seq. These federal funds, to the extent received up to $481,581, were to be paid to the Institute for the operation of the two County libraries located outside of Wilmington. The Court is of the opinion that this formalization of the Institute's status as the operator of the County's library system was prompted by administrative provisions of federal law, 31 U.S.C. §§ 1241–1243, and in no way rendered dubious Folsom's uncontradicted testimony (Tr. 290) concerning the period between 1967 and 1973, the years in question.

emphatically denied that the New Castle County government was involved or even concerned about the daily operation of the Institute, including the hiring, firing or promotion of employees and administrators. (Tr. 290, 301, 302). County appropriations for calendar year 1972 were $416,000 (Docket Item 31, par. 6(c)) and City appropriations for fiscal year 1971–1972 totaled $537,000 (PX 41), but other than these large sums of money routinely granted to the Institute there is no other evidence of external governmental supervision over the Institute's Board of Managers or its Director. There is also a lack of evidence concerning the involvement of the *ex officio* members of the Board of Managers who are City or County officials (Tr. 732, 677–8), and it is clear that the convening of the Special Committee [to reconsider Chalfant's discharge], comprised of three non-governmental Board members, was primarily, if not exclusively, the decision of duPont and Abrams. (Tr. 679–680, 695, 733; Docket Item 35 at p. 3).

417 F.Supp. 160, 163–65 (D.Del.1976) (some footnotes omitted).

As an appellate tribunal, we are bound by the district court's findings of fact unless they are "clearly erroneous." Fed.R.Civ.P. 52(a); *Krasnov v. Dinan, supra,* 465 F.2d at

1302. Each of Judge Latchum's findings of fact is fully substantiated by evidence in the record. His findings are also clearly articulated so that we as an appellate court may properly evaluate each of them and apply the appropriate standard of review. *See O'Neill v. United States,* 411 F.2d 139, 146 (3d Cir. 1969); *Bowles v. Cudahy Packing Co.,* 154 F.2d 891, 894 (3d Cir. 1945). Chalfant therefore does not, and could not, contend that Judge Latchum's findings are clearly erroneous: indeed, at oral argument Chalfant conceded that she did not challenge them. Even Judge Gibbons, writing for the majority, acknowledges that "[m]ost of the historical or narrative facts upon which the [District] Court predicated its legal conclusion that state action was lacking are not disputed in any material respect." Maj. Op. at 742.

Yet the majority opinion, despite its recognition that the district court's findings of fact are not clearly erroneous, wholly disregards those findings. Instead the majority asserts: "There is additional, undisputed evidence in the record which is relevant to the governmental status of the Wilmington Institute, but which the District Court, in its opinion below, did not specifically mention." *Id.* at 742. The majority opinion then proceeds to winnow from the record selective pieces of evidence which *it* finds will support the result that state action exists.

For example, the majority discusses at length two funding and record-keeping agreements between New Castle County and the Wilmington Institute (PX 36 and PX 37). Maj. Op. at 742–743. Although these agreements were not in effect at the time of Chalfant's discharge in 1972, the majority opinion relies upon them to make its own unsubstantiated finding that "they do show the nature of the relationship between the county government and the public library, a relationship which antedated federal funding." *Id.* at 743.[2] By contrast, with that same evidence before it, the district court

2. The majority opinion fails to explain how the funding and record-keeping agreements which *post-dated* Chalfant's discharge can have any

effect upon the status of the Institute at a time prior to their execution.

found that "at least until 1974, neither the City of Wilmington nor New Castle County probed into the Institute's budgetary needs or fiscal administration, or meddled in its overall management, let alone its employment practices." 417 F.Supp. at 165–66.

Similarly, to demonstrate that the Institute was government operated and not privately controlled, the majority quotes at length from a Wilmington Institute Staff Handbook, emphasizing that "[t]he members of the Board of Managers donate their time and energies to the library as a community service. *The Director and all staff members are paid public servants*" (PX 35). Maj. Op. at 741 (emphasis in majority opinion).[3] This handbook was in evidence and before the district court. Yet the district court, contrary to what the majority would find, found on this and other evidence that the significant factor concerning library personnel was that the Institute's "active management" was "retained" by the "Board of Managers, a majority of whom were and are private citizens," 417 F.Supp. at 165, and that apart from government funding "there is no other evidence of external governmental supervision over the Institute's Board of Managers or its Director." *Id.*[4]

Fairly read, the majority opinion stands for the proposition that, despite findings of

fact made by the district court which cannot be overturned because they are supported by evidence, the presence in the record of additional evidence which has not been specifically mentioned by the district court permits a court of appeals to find its own facts, without being bound by the district court's findings. I find that proposition completely unique and unsupportable. There is no precedent for such a standard of review. To the contrary, this court and others have consistently held that a district court is *not* required to make findings on all the evidence presented if the findings that it does make are sufficient to support its ultimate conclusion. Furthermore, the district court need not make findings which assert the reciprocal negative of each of its affirmative findings. *Rayonier Inc. v. Polson,* 400 F.2d 909, 923 (9th Cir. 1968); *see Bowles v. Cudahy Packing Co., supra,* 154 F.2d at 894. Having found for example that Chalfant had been discharged on February 16, 1972, the district court was not required to find that she was *not* discharged on February 15th or February 17th, or on any other date in any other year. Accordingly, having found that the evidence (particularly the testimony of Edward duPont, President of the Board of Managers) established control of the Insti-

---

3. If I were the district court fact-finder rather than a member of a reviewing tribunal, I would interpret that portion of the handbook not as indicating a sovereign ("public") function as distinct from a private function but rather as contrasting the *voluntary* nature of the Board's duties with the *salaried* status of other personnel. However, as I have attempted to demonstrate throughout this dissent, those facts which we as appellate judges might find based upon our varying interpretations of the evidence are completely irrelevant. Our only concern can be with whether the evaluation of evidence and the findings of fact derived therefrom by the district court judge are supported by evidence in the record, regardless of our agreement or disagreement with the facts so found.

4. Two additional examples are noted because of the importance given them in the majority opinion. First the majority refers to the county government's interest in personnel policies, as demonstrated by reference to a letter in evidence written by the county executive (PX 19)

and reproduced on page 743 of the majority opinion. The impression is thereby given that the district court's finding of fact that "the active management of the Institute's operations was retained by the self-perpetuating Board of Managers, a majority of whom were and are private citizens," 417 F.Supp. at 165, is clearly erroneous. Yet the majority does not and cannot so hold—a flaw which I find fatal to the majority's position.

Again, the majority opinion sets forth an interrogatory which was answered by the Institute, admitting that the Institute "is not a corporate entity [but] is a management title under which City and County libraries are operated." (Docket Item 31). Maj.Op. at 743. Significantly neither the interrogatory nor its answer was in evidence, but even had they been, this isolated admission, and the county executive's letter referred to by the majority, could constitute no more than two fragments of a congery of evidence from which the district court ultimately made its findings.

tute by "private citizens," [5] Judge Latchum was not required to "find" that the one piece of conflicting evidence (the letter from William J. Conner (PX 19)), did *not* suffice to establish governmental control. Similarly, having found that the evidence established that the government was not involved with the Institute's budgetary management and employment policies before 1974, Judge Latchum was under no duty to add to that finding that the *post-discharge* agreements (PX 36 & PX 37) were insufficient to establish that the government *was* involved before 1974.

By rejecting the district court's evaluation and assessment of the evidence, however, the majority opinion has now apparently imposed a duty of making reciprocal findings upon the district court. The majority's rationale would require in effect that the district court negate each of its affirmative findings by a separate, independent reciprocal finding which recites the unpersuasiveness of the evidence which it rejects.

The majority having determined that the district court did not meet this novel standard which is now to be employed, one would then expect that the majority would remand the proceedings to the district court for that purpose. Not so. Rather, the majority has substituted its own process of evaluating and assessing certain isolated pieces of evidence in order to arrive at a legal conclusion compatible with the result it prefers. This conclusion, as I have stated, has been reached wholly without reference to the actual findings made by the district court—findings by which we are bound.

Our court has previously stated:

> The trial court is not required to make findings on all the facts presented . . . The judgment should stand if the opinion below gives the appellate court a clear understanding of the basis of the decision.

*Bowles v. Cudahy Packing Co., supra,* 154 F.2d at 894. More recently our court added

to this "sufficiency" standard the requirement that the district court make subordinate factual findings in support of its ultimate findings so as to allow us to ascertain "what evidence the District Judge accepted as credible or what he rejected," *O'Neill v. United States, supra,* 411 F.2d at 146, and to provide "a basis for review of the District Judge's finding[s]," *id. Accord, Kreda v. Rush,* 550 F.2d 888, 890 (3d Cir. 1977) (case remanded to the district court "to specify the reasons on which its disposition is premised so as to inform the parties and facilitate review"); *FTC v. British Oxygen Company, Ltd.,* 529 F.2d 196, 200 (3d Cir. 1976) (en banc) (remand ordered as "there is no means for the reviewing court to determine what evidence served as the basis for the injunction"); *Pepi, Inc. v. Helcar Corp.,* 458 F.2d 1062, 1064–65 (3d Cir. 1972) (quoting *O'Neill*).

In sharp contrast to the findings made in *O'Neill, Kreda, British Oxygen,* and *Pepi,* the district court here met the sufficiency standard by making extensive subordinate and ultimate findings. By so doing the district court has afforded us a proper basis for review. *See Kreda v. Rush, supra,* 550 F.2d at 890; *FTC v. British Oxygen Co., Ltd., supra,* 529 F.2d at 200; *O'Neill v. United States, supra,* 411 F.2d at 146.

Other courts of appeals have adopted similar standards of sufficiency. The Court of Appeals for the Ninth Circuit explained:

> the federal rule relating to findings of a trial court does not require the court to make findings on all facts presented or to make detailed evidentiary findings; if the findings are sufficient to support the ultimate conclusion of the court they are sufficient. [Citation] Nor is it necessary that the trial court make findings asserting the negative of each issue of fact raised. It is sufficient if the special affirmative facts found by the court, construed as a whole, negative each rejected contention. The ultimate test as to the adequacy of findings will always be whether they are sufficiently comprehensive and pertinent to the issues to provide

a basis for decision and whether they are supported by the evidence.

*Rayonier Inc. v. Polson, supra,* 400 F.2d at 923, *quoting Carr v. Yokohama Specie Bank, Ltd.,* 200 F.2d 251, 255 (9th Cir. 1952); *accord, Amerline Corp. v. Cosmo Plastics Co.,* 407 F.2d 666, 669–70 (7th Cir. 1969) (district court "was not required to make findings with respect to all evidence introduced"); *Weaver v. United States,* 334 F.2d 319, 320–21 (10th Cir. 1964); *see* 5A J. Moore, Moore's Federal Practice ¶ 52.06[1], at 2710, 2713–16 & n.26 (2d ed. 1977) ("the court need not find [facts] on every issue requested, but a finding of such essential facts as lay a basis for the decision is sufficient"; "[f]indings need not assert the negative of rejected propositions"), *citing* Committee Note of 1946 to Rule 52(a), *reprinted in* 5A Moore's Federal Practice, *supra,* ¶ 52.-01[6], at 2606–07 ("the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts"); 9 C. Wright & A. Miller, Federal Practice and Procedure § 2579, at 715 (1971) ("[t]he ultimate test of the adequacy of a trial judge's findings is whether they are sufficiently comprehensive and pertinent to the issues to provide a basis for decision").

The First Circuit Court of Appeals has articulated this rule even more forcefully:

It is settled that an appellate court has no power to disturb a finding of fact of a trial court where it is based on some substantial though conflicting evidence. *Jue v. Bass,* 299 F.2d 374, 377 (9th Cir. 1962). An appellate court, in determining the presence or absence of substantial evidence, is not required to reweigh the evidence adduced in the trial court but need only scrutinize the record to ascertain if it affords some reasonable basis for the result achieved. *Lattig v. Pilliod,* 289 F.2d 478 (7th Cir., 1961).

"It is not our function to hold a trial de novo in which the whole controversy begins anew and in which every disputed factual controversy and every possible inference is earnestly debated, measured, evaluated and tallied only to reach for the next disputed factual issue to inventory in like fashion." *Travelers Insurance Company v. Truitt,* 280 F.2d 784, 788 (5th Cir., 1960).

In sum, we are not to substitute our judgment for that of the trial court, *Homestake Mining Co. v. Mid-Continent Exploration Co.,* 282 F.2d 787, 796 (10th Cir., 1960), but may reverse only where, upon a consideration of the entire evidence, we are "left with a definite and firm conviction that a mistake has been committed." *McAllister v. United States,* 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954).

*Evans v. United States,* 319 F.2d 751, 753 (1st Cir. 1963).

The majority opinion here does precisely what our sister circuits have renounced, for the majority has "h[e]ld a trial de novo in which . . . every disputed factual controversy and every possible inference is earnestly debated, measured, evaluated, and tallied." This role is of course for the fact-finder, not for us. Precisely because reasonable minds differ as to the probative value and weight of evidence,[6] it is the district court judge who, having conducted the trial, is accorded the role of fact-finder. While we might well assess the facts differently were we the district court, we are not. Furthermore, not being the fact-finder, we may not overturn findings on appeal unless they are clearly erroneous. Judge Aldisert has stated this principle in such unequivocal and classic terms that it bears repetition here:

"In reviewing the decision of the District Court, our responsibility is not to substitute findings we could have made had we been the fact-finding tribunal; our sole function is to review the record to determine whether the findings of the District Court were clearly erroneous, i. e., whether we are 'left with a definite and firm conviction that a mistake has been committed.'" *Speyer, Inc. v. Hum-*

---

**6.** *See, e. g.,* nn.2–4 *supra.*

*ble Oil and Refining Co.,* 403 F.2d 766, 770 (3d Cir. 1968). It is the responsibility of an appellate court to accept the ultimate factual determination of the factfinder unless that determination either (1) is completely devoid of minimum evidentiary support displaying some hue of credibility, or (2) bears no rational relationship to the supportive evidentiary data. Unless the reviewing court establishes the existence of either of these factors, it may not alter the facts found by the trial court. To hold otherwise would be to permit a substitution by the reviewing court of its finding for that of the trial court, and there is no existing authority for this in the federal judicial system, either by American common law tradition or by rule and statute.

*Krasnov v. Dinan, supra,* 465 F.2d at 1302.

In ignoring these fundamental precepts, Judge Gibbons, writing for the majority, is guilty of the very process which he condemned in his dissenting opinion in *Linmark Associates, Inc. v. Township of Willingboro,* 535 F.2d 786, 805 (3d Cir. 1976), *rev'd,* 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977), when he stated in reference to the *Linmark* majority:

> in utter disregard of the standard of review imposed on this court by Rule 52, Fed.R.Civ.P., the majority, by a disingenuous process of selection and omission, sifts through the record below to construct its own findings to justify a predetermined result. . . . [Its] opinion completely inverts the respective roles of the trial and appellate courts, and is an instance of ad hoc decision making.

*Id.* at 810.[7]

Having failed to demonstrate that the district court's facts were not supported by evidence, this court is necessarily bound by the district court's findings and cannot avoid the ultimate conclusion to which they lead by usurping the district court's function and finding its own facts.

## II.

If the district court's findings of fact are accepted, as I believe they must be on the present record, then the result reached by the majority opinion cannot stand.

The following findings are particularly instructive to our legal analysis and bear emphasis.

1. The Institute was governed by a Board of Managers which consisted of 10 nongovernmental members and 8 *ex officio* members. 417 F.Supp. at 165 n.13.

2. "[T]he active management of the Institute's operations was retained by the self-perpetuating Board of Managers, a majority of whom were and are private citizens." *Id.* at 165.

3. During 1972 and 1973, approximately 90 per cent of the Institute's income was contributed by the City of Wilmington and New Castle County. *Id.* at 165 & n.14; App. at 28–30.

4. "[O]ther than [the] large sums of money routinely granted to the Institute there is no other evidence of external governmental supervision over the Institute's Board of Managers or its Director." *Id.* at 165.

5. "There is also a lack of evidence concerning the involvement of the ex officio members of the Board of Man-

---

**7.** The majority opinion has apparently announced a new and unique standard of review applicable to findings of fact. That standard is couched in terms of: do "[a]ll of these facts and circumstances convince us"? Maj. Op. at 745. As I understand our procedure in this Circuit, an en banc court may overrule prior precedent whereas a panel is precluded from doing so. Internal Operating Procedures of the United States Court of Appeals for the Third Circuit, § M.2 (1974). However, even if the majority here intended adopting a standard of review different from the "clearly erroneous" standard recited in *Krasnov v. Dinan, supra,* it would be precluded from doing so by Fed.R. Civ.P. 52(a) which prescribes this precise standard. However, I do not attribute such an intention to the majority. I question only the majority's refusal to treat fairly with the correct standard and the majority's willingness to adopt a substantially different and less rigorous test.

*agers who are City or County officials . . . ."*[8] *Id.* at 165.

6. *"[I]t is clear here that at least until 1974, neither the City of Wilmington nor New Castle County probed into the Institute's budgetary needs or fiscal administration, or meddled in its overall management, let alone its employment practices."* *Id.* at 165–66.

7. *"The record conclusively shows that the State of Delaware has never had any contention with the funding or operation of the Institute."* *Id.* at 163 n.6.

(Emphasis added.)

As this case is being considered en banc, we look first to most recent Supreme Court decisions to determine whether the discharge of Chalfant by the Wilmington Institute constituted state action. Three categories of state action defined by the Supreme Court and discussed in recent opinions of this court are:

(1) where state courts enforced an agreement affecting private parties [*e. g., Shelley v. Kraemer,* 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948)]; (2) where the state "significantly" involved itself with the private party [*e. g., Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)]; and (3) where there was private performance of a government function [*e. g., Terry v. Adams,* 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (white primary case)]. *Hollenbaugh v. Carnegie Free Library,* 545 F.2d 382, 383 (3d Cir. 1976), *quoting Magill v. Avonworth Baseball Conference,* 516 F.2d 1328, 1331 (3d Cir. 1975).

It is obvious that *Chalfant* does not fall into the first category. This is clearly not a case in which "the state courts enforced an agreement affecting private parties." Nor do I believe that *Chalfant* involves the third category: "the exercise by a private entity of powers traditionally exclusively reserved to the State" or "traditionally associated with sovereignty." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352–53, 95 S.Ct. 449, 42 L.Ed.2d 477 (1975). Whereas the majority opinion implicitly attempts to bring this case within that framework,[9] I believe that our court was correct when it stated but one year ago that "nor can it be said that the operation of a library constitutes private performance of a function traditionally associated with sovereignty." *Hollenbaugh, supra,* 545 F.2d at 383.[10]

In contending that state action is present in this case, Chalfant has concentrated on the second category identified in *Hollenbaugh.* The crux of her argument, and of

---

8. The district court clearly believed the following testimony of duPont concerning the manner in which the Board of Managers functions (*see* 417 F.Supp. at 165):

Q. . . . Can you tell me who elects the Board of Managers?
A. The Board of Managers—we have a nominating committee which we appoint, and in effect we elect ourselves. The stock is held in trust, or I believe it is the Bank of Delaware, and we in effect elect ourselves.
Q. Do you get any direction at all from the City, the County or the State of Delaware?
A. No sir.
Q. . . . [Y]ou don't direct the activities within the library itself?
A. No sir.
Q. Are you paid for this position?
A. No, sir.
Q. Are the other members of the Board?
A. No.
Tr. 732–33.

9. The majority opinion notes that "[t]he city's interest lies in the *government function* of edu-

cating the public by providing . . . a public library." Maj. Op. at 745 (emphasis added).

10. I am perplexed by the conflicting views of "sovereign function" which appear in one guise in *Hollenbaugh* and in another one here. In *Hollenbaugh,* Judge Aldisert wrote and Judge Gibbons joined in the unanimous opinion which, as noted, stated that library operation was not a sovereign function. Here Judge Aldisert has joined with Judge Gibbons and the majority in representing the contrary. In all fairness it might be said that in this respect *Hollenbaugh* may no longer be the prevailing view in this Circuit judging from the fact that *Chalfant* represents an en banc majority whereas *Hollenbaugh* was only a panel opinion. My confusion in this respect stems from the fact that the majority opinion has not addressed this point directly nor has the majority even adverted to it despite its rather extensive analysis of *Hollenbaugh.*

the majority's opinion, is that here we are presented with a case in which the state is "significantly" involved with a private party. To test that thesis requires a two-fold inquiry:

"whether there is a sufficiently close nexus between the State and the challenged action . . . so that the action of the latter may be fairly treated as that of the State itself," *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974), *citing Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 176, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), or whether the "State has so far insinuated itself into a position of interdependence with [the library] that it must be recognized as a joint participant in the challenged activity." *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 862, 6 L.Ed.2d 45 (1961).

*Hollenbaugh, supra,* 545 F.2d at 383 (brackets in original).

Contrary to the majority, I am convinced that the findings of fact made by the district court in this case, each of which is supported by evidence, fail to demonstrate either a "nexus" or an "interdependence" sufficient to establish state action by the Institute.

I reiterate the position expressed in my concurrence in *Braden v. University of Pittsburgh,* 552 F.2d 948, 965 (3d Cir. 1977) (en banc) that the *Burton* "symbiosis" standard has been strictly narrowed if not eroded by subsequent Supreme Court precedent. 552 F.2d at 973. I explained in *Braden* that

*Moose Lodge, Gilmore* [v. *City of Montgomery,* 417 U.S. 556, 573, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974)], and *Jackson* place a gloss upon *Burton* which we are not free to ignore. The teaching of those cases is that "neither general government involvement nor even extensive detailed state regulation is sufficient for a finding of state action. Rather, the state must affirmatively support and be directly in-

volved in the specific conduct which is being challenged." (Footnote omitted.) *Cannon v. University of Chicago,* [559 F.2d 1063, 1069 (7th Cir. 1976), *aff'd on rehearing,* 559 F.2d 1077 (7th Cir. 1977) (Title IX claim)].

552 F.2d at 973.[11]

Assuming however that the majority is correct in its interpretation of *Burton* and that state action can be demonstrated absent governmental involvement in the specific challenged act, I am still unable to find a *Burton* -type symbiosis here.

In *Burton* the Supreme Court "held that a private restaurant owner who refused service to a customer because of his race, violated the Fourteenth Amendment where the restaurant was located in a building owned by a state-created parking authority and leased from that authority." *Braden v. University of Pittsburgh, supra,* 552 F.2d at 957. The present case is not comparable to *Burton* for at least three reasons.

First, *Burton,* unlike this case, involved racial discrimination, the principal evil against which the fourteenth amendment was directed. As our court recently recognized, state action precedents which developed in racial discrimination cases do not have the same force in other contexts.[12]

Second, in *Burton,* unlike this case, the appellate court was not faced with detailed findings of fact showing that the relevant governmental units actually exerted no control over the actions of the private entity. In *Burton* the trial court entered judgment for the plaintiff after all the parties had conceded that there were no material facts in dispute. *Burton v. Wilmington Parking Authority,* 38 Del.Ch. 266, 267, 150 A.2d 197, 198 (Ch.1959). In *Burton,* no attempt was made by the defendant parking authority to show a lack of control by the authority over the restaurant. Here, on the other hand, evidence was introduced from which the district court found that state played *no*

---

11. *Accord, Schlein v. Milford Hospital, Inc.,* 561 F.2d 427, 428–29 (2d Cir. 1977) (per curiam).

12. *Parks v. "Mr. Ford,"* 556 F.2d 132, 137 (3d Cir. 1977) (en banc) (plurality opinion); *id.* at 162 (Hunter, J., concurring); *accord, Schlein v. Milford Hosp., supra,* 561 F.2d at 428 n.5.

role in the challenged actions and that it did *not* control the operations or management of the Institute in general. As a result, this appeal stands on an entirely different footing from the appeal in *Burton.*

Finally, Chalfant has failed to prove that the relationship between the state and the Institute was "symbiotic"[13] or one of "interdependence"[14] in the same sense as the relationship between the restaurant and the parking authority in *Burton.* In *Burton,* the rent received by the parking authority from the lease of portions of its parking garage was an "indispensable part of the State's plan to operate its project as a self-sustaining unit."[15] 365 U.S. at 724, 81 S.Ct. at 861. The restaurant drew additional customers because of its convenient location, and it alleged that "for it to serve Negroes would injure its business." *Id.* Consequently, the Supreme Court concluded that "profits earned by discrimination not only contribute to, but also are indispensable elements in, the financial success of a governmental agency." *Id.* at 724, 81 S.Ct. at 861. In other words, the restaurant earned extra profits because of its location in a public facility, and the State received "profits earned by discrimination," a practice in which it could not itself engage. Thus the relationship between the State and the restaurant in *Burton* was a classic illustration of symbiosis: a relationship in which each partner does for the other something which the other partner needs but cannot do for itself.

In this case, by contrast, no such relationship was proved. The district court found:

Plaintiff has failed to show that this public funding was in any way motivated by the City's and County's belief that it would be less expensive to support a privately run library, which might be able to operate on a lower salary scale and with fewer employee benefits than either governmental body would be required to spend to operate a library or libraries directly, i. e., on their own and in their own facilities.

417 F.Supp. at 166.

Undoubtedly the state benefited in a sense from the services provided by the Wilmington Institute, since the Institute's facilities are open to the people of the Wilmington area. But there is no evidence to support a finding that the state was "dependent" upon the Institute any more than any government is "dependent" upon those innumerable charitable and nonprofit organizations which it exempts from taxes.

Nor do the district court's findings reveal that the state significantly participated in the Institute's day-to-day or overall affairs —financial, managerial or otherwise. *See id.* at 163–65. The majority opinion "concede[s]" that "the city has no interest in the tenant's revenues." Maj. Op. at 745. And as previously stated the district court found no supervision exercised by the state over the Institute. Hence the majority's attempt to force this case "squarely within even the narrowest reading of *Burton* ", *id.,* must necessarily fail.

Nor can Chalfant prevail under *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), *Gilmore v. City of Montgomery,* 417 U.S. 556, 94 S.Ct. 2416, 41 L.Ed.2d 304 (1974), or *Moose Lodge*

13. *Jackson v. Metropolitan Edison Co., supra,* 419 U.S. at 357, 95 S.Ct. 449; *Moose Lodge No. 107 v. Irvis, supra,* 407 U.S. at 175, 92 S.Ct. 1965.

  It is true, as the majority opinion notes, that both *Burton* and the instant case involved situations in which the state was the lessor and the private entity was the lessee. But while the two situations may be somewhat similar in form, they are radically different in substance. *Burton* involved an ordinary commercial lease from which the state hoped to earn a profit. In this case, the Wilmington Institute owned the library property prior to 1923. In that year, for reasons which do not appear in the record, the

Institute conveyed the library's property to the City and the City granted a perpetual rent-free lease of the building back to the Institute. 417 F.Supp. at 164. Thus, while the form of a lessor-lessee relationship exists in both *Burton* and the present case, the substance of a symbiotic relationship is not present here.

14. *Burton v. Wilmington Parking Authority, supra,* 365 U.S. at 725, 81 S.Ct. 856.

15. *See also Wilmington Parking Authority v. Ranken,* 34 Del.Ch. 439, 445–46, 105 A.2d 614, 618 (Sup.Ct.1954).

*No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), because she failed to establish a "nexus" between the state and the challenged actions of the Institute and its officers. *See* 419 U.S. at 351, 95 S.Ct. 449; 417 U.S. at 573, 94 S.Ct. 2416; 407 U.S. at 176–77, 92 S.Ct. 1965. Indeed, Chalfant conceded at oral argument that the state was not involved in her dismissal and that therefore she could not meet the *Jackson* test.

There was no evidence to sustain a finding that the state played any role in Director Bryant's initial decision to dismiss Chalfant. When Chalfant's attorney requested reconsideration of that decision, he wrote to Bryant and to Edward duPont and Richard Abrams, two non-governmental members of the Board. The district court found that "the convening of the Special Committee, [which ratified Bryant's decision,] was primarily, if not exclusively the decision of duPont and Abrams." 417 F.Supp. at 165. The hearing conducted by the Special Committee was held on private premises with duPont presiding. There is no evidence and hence there could be no finding, that the entire Board was asked to, or sought to, review the Special Committee's decision. There is also no evidence to suggest that government officials or entities had anything to do with a letter concerning Chalfant which duPont wrote to

the American Library Association (ALA). It therefore seems clear, and Chalfant agrees, that there is no nexus between the state and the actions which form the basis of Chalfant's complaint. Consequently, there is no state action that can be said to exist under the theory of *Jackson v. Metropolitan Edison Co., Gilmore v. City of Montgomery,* and *Moose Lodge No. 107 v. Irvis.*[16]

In sum, based upon the district court's findings of fact, it is evident Chalfant has failed to demonstrate either a "symbio[tic]" relationship between the state and the Institute or a "nexus" between the state and Chalfant's discharge.

### III.

I also disagree with the majority in its reading of this Circuit's recent precedent on the state action question. Specifically, I cannot agree that "[c]ompared to *Hollenbaugh* [where we found state action], this is an a fortiori case." Maj. Op. at 745.

In *Hollenbaugh,*[17] discharged library employees brought suit against their employer under 42 U.S.C. § 1983. The district court granted summary judgment in favor of the library based upon a perceived lack of state action. This Court reversed, holding that "[t]he totality of circumstances compels our conclusion that state involvement in the library's operation was significant." 545 F.2d at 385.

---

**16.** The majority opinion asserts that the district court improperly applied a "nexus" test to determine the primary question of "whether the employer was governmental or private." Maj. Op. at 746. In making that assertion the majority claims that the district court "looked at the status of the agent [the Board of Managers] to determine the nature of the principal [the Institute]." *Id.* I read Judge Latchum's opinion differently. I believe Judge Latchum has faithfully followed and applied the state action teachings of the Supreme Court and of our Circuit, *e. g., Magill v. Avonworth Baseball Conference,* 516 F.2d 1328, 1334 (3d Cir. 1975). The district court, having made detailed findings and having engaged in an extensive legal analysis that no indicia of governmental involvement in the Institute existed other than funding, stated: "In conclusion, on the present record, the Court finds that no symbiotic *quid pro quo* relationship existed between the Institute, the City of Wilmington or New Castle County at the time plaintiff was discharged.

*See Broderick v. The Associated Hospital Service of Philadelphia, supra,* [536 F.2d 1,] at 6–8 [3d Cir.]." 417 F.Supp. at 166.

In addition, the district court dealt with *Jackson v. Metropolitan Edison Co., supra,* stating: "*Jackson* demands the existence of a nexus between governmental involvement and the challenged action of the non-governmental entity, and it is clear here that at least until 1974, neither the City of Wilmington nor New Castle County probed into the Institute's budgetary matters or fiscal administration, or meddled in its overall management, let alone into its employment practices." *Id.* at 165–66 (footnote omitted).

Having properly analyzed the record in terms of both a *Burton* "symbiosis" and a *Jackson* "nexus", the district court's approach cannot be faulted.

**17.** *Hollenbaugh v. Carnegie Free Library,* 545 F.2d 382 (3d Cir. 1976).

In its analysis, the *Hollenbaugh* court determined that the " 'receipt of money from the State is not, without a good deal more, enough to make the recipient an agency or instrumentality of the Government.' " *Id., quoting Grossner v. Trustees of Columbia University,* 287 F.Supp. 535, 547–48 (S.D.N.Y.1968). But, in *Hollenbaugh* the court found that "there was a good deal more." 545 F.2d at 385. The "good deal more" in *Hollenbaugh* consisted not only of 90% government financing, but also, a tax expressly designed to support the library had been imposed; there was an explicit representation that the library was to act as agent for and on behalf of the City; and the governmental authorities had the power to appoint a majority of the library's board of trustees. *Id.*[18] The precise language used by the *Hollenbaugh* court and which led to its conclusion that state involvement in the library's operation was significant reads:

> But here we believe there was a good deal more. There was massive government financing, in the vicinity of 90 percent rather than the 49 or 51 percent discussed in *Poindexter* [*v. Louisiana Financial Assistance Comm'n,* 275 F.Supp. 833, 854 (E.D.La.1967), *aff'd mem.,* 389

U.S. 571, 88 S.Ct. 693, 19 L.Ed.2d 780 (1968)]; and the city had authorized the imposition of a tax for the express purpose of supporting the library. Although concededly not controlling, we believe these are significant factors. Unlike *Magill,* where "[p]laintiff's evidence did not establish that the program was represented as being sponsored by the municipalities", 516 F.2d at 1335, here there was an explicit representation that the library was to act "as agent for and on behalf of" the school district and the city in providing public library service. In addition, a majority of the library's trustees were appointable by governmental bodies. The totality of these circumstances compels our conclusion that state involvement in the library's operation was significant.

545 F.2d at 385.

Here, however, with the exception of "government financing," a significant but not controlling factor in the *Hollenbaugh* calculus, none of the other *Hollenbaugh* factors is present.[19] Whereas in *Hollenbaugh* an express tax had been imposed and an explicit representation of agency had been made, here no such factors can be found.[20] Moreover, whereas in *Hollenbaugh* the majority of the library's board of

---

18. The opinion in *Hollenbaugh* does not disclose exactly what percentage of the library's board of trustees was appointed by governmental bodies. The opinion reveals that 11 of the trustees were government officials, but it does not indicate the total number of trustees in office at that time. A total of 24 trustees was authorized, but there were at least four vacancies. *See Braden v. University of Pittsburgh, supra,* 552 F.2d at 974 n.15 (Garth, J., concurring).

19. *See* 417 F.Supp. at 165–66.

20. The majority opinion states:
    As in *Hollenbaugh,* contracts designate the employer as an agent of the government in furnishing public library services to the public. The only relevant factual distinction between this case and *Hollenbaugh* is the absence of a *specific* tax earmarked for support of the library. But in place of a specific tax, the state legislature has by legislation decided the level of appropriations from general tax revenues for library services. Thus, both here and in *Hollenbaugh,* state law defines the level of library services. Moreover, the

record here discloses much greater public involvement. Even the structure, organization and management of the Board of Managers is mandated by state legislation. 19 Del.Laws Chaps. 734 and 983. . . .
Maj. Op. at 745. Neither the record nor the Delaware laws to which the majority makes reference supports these facts or permits the conclusion that the Wilmington Institute is an agent of the state. Indeed, the majority's analysis ignores the *express* statement found in *Hollenbaugh* that the Carnegie Library had accepted designation by the school district and the city to act as an agent for those entities. 545 F.2d at 384. As noted in the text above, no such representation of agency is present or was found by the district court here. Nor do post-hoc funding agreements which have not been shown to implicate the period of Chalfant's discharge establish such an agency relationship. Hence, the majority's attempt to equate this case (where no governmental authority had authorized the imposition of a library tax, or designated the library as agent), with *Hollenbaugh* (where the court there found that a specific library tax had been imposed, and an

trustees were appointed by governmental bodies, here by contrast a majority of the Institute's Board of Managers was privately appointed.[21] Hence, except for the receipt of money from units of local government, a factor expressly rejected as constituting state action without more,[22] none of the factors present in *Hollenbaugh* is present here. Consequently in this case, there is little evidence of significant governmental involvement with the Institute. Indeed, the district court found after trial that the "active management" of the Institute was controlled by the privately-appointed majority of the Board of Managers and that "other than [the] large sums of money routinely granted to the Institute there is no other evidence of external governmental supervision over the Institute's Board of Managers or its Directors." 417 F.Supp. at 165.[23] Thus, applying the "totality of circumstances" test stated in *Hollenbaugh*,[24]

express agency created), is neither fortunate nor helpful.

21. The majority states that a *self-perpetuating* method of selecting Board members may not be "any less governmental" than a system of *electing* Board officials by public franchise. Maj. Op. at 746. While I might agree with this proposition if the self-perpetuating board were composed of public officers rather than private individuals, I cannot agree with the scope of this statement in the context of this case. Here it was not the self-perpetuating feature of the Board which the district court found significant. Rather the district court emphasized in its findings that the Board consisted of *"private citizens"*, 417 F.Supp. at 165 (emphasis added), who were not selected by virtue of holding title to public office. Moreover the record in this case, and in particular the district court's findings, will not sustain any implication that the mere service of a self-perpetuating private Board converts private action into state action.

22. *Hollenbaugh, supra,* 545 F.2d at 385; *accord, Bethel v. Jendoco Construction Corp.,* 570 F.2d 1168, at 1176–1177 (3d Cir. 1978); *cf. United States v. Orleans,* 425 U.S. 807, 815, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) (in determining whether a community action agency is an agency of the United States as opposed to a governmental contractor for purposes of recovery under the Federal Tort Claims Act, "the question here is not whether the community action agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government").

23. Judge Gibbons in his legal analysis for the majority cites *Kerr v. Enoch Pratt Free Library,* 149 F.2d 212, 219 (4th Cir. 1945) (*Pratt*). He quotes from that decision to justify the conclusion which the majority here has reached. Maj. Op. at 746.

I observe however that if a record similar to *Pratt's* had been developed in the context of this case, Judge Latchum's result undoubtedly would have comported with the result reached in *Pratt,* and there would have been no occasion for this dissent.

The record in *Pratt* established that the city's and county's influence, control, and operation were all-pervasive, 149 F.2d at 215–17, and thus state action was properly found to exist so as to prevent the continuation of invidious racial discrimination, *id.* at 218. Here however the district court has found no such city, county or state influence, control, operation or nexus in the context of an employment dispute. 417 F.Supp. at 163–65. It is because of this essential difference that the majority's reference to *Pratt* does not bolster its conclusion.

24. *Hollenbaugh* is distinguishable for another, equally significant, reason. Since the *Hollenbaugh* court was reviewing an order disposing of a motion for summary judgment, it was required to give to the employees—the parties opposing the motion—"the benefit of all reasonable doubts and inferences." 10 C. Wright & A. Miller, Federal Practice and Procedure § 2725, at 510 (1971). Viewed in that light, the evidence of the extensive governmental funding which occurred in *Hollenbaugh* was probably enough by itself to defeat the library's summary judgment motion. Where the government has provided nearly 100 per cent of a private institution's financial requirements, certainly it is reasonable to assume at the summary judgment stage that the complaint should not be dismissed because of an absence of state action. *See Braden v. Univ. of Pittsburgh, supra,* 552 F.2d at 974 (Garth, J., concurring). But once past the summary judgment stage, it is the findings respecting state action which control and any presumptions dependent upon financing are no longer relevant.

Similarly, precisely because *Braden* presented an appeal from a denial of a summary judgment motion made by the defendant, its holding does not have the breadth attributed to it by the majority opinion. Maj. Op. at 744. *Braden* holds no more than at that procedural stage, facts which demonstrate (1) massive government financing of the defendant, 552 F.2d at 960; (2) a legislative designation of the defendant as an "instrumentality" of the state, *id.* at 959; and (3) a possible surrender by defendant of "much of its fiscal autonomy", *id.* at 960, will suffice to defeat defendant's motion

the Wilmington Institute cannot be characterized as a state entity for purposes of § 1983.

Essentially therefore I disagree with the majority because of the importance of the district court's fact findings which the majority has overlooked. It is for that reason that this case is far different from other state action cases and in particular from *Hollenbaugh.* Were it not for the explicit and detailed findings of fact made by the district court judge which compel the conclusion that no state action exists, this dissent would not have been necessary. But giving proper credit to the district court's fact findings in the first instance, and then having analyzed state action doctrine as applied to those findings, I would affirm the district court's judgment in favor of the Institute.

## IV.

I would also affirm the district court's dismissal of Chalfant's pendent state claims. The district court based the dismissal of Chalfant's pendent claims on alternative grounds: (1) that, under *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), it lacked power to hear those claims since they did not concern the same "nucleus of operative fact" as her federal claims; and (2) that, even if the court had the constitutional power to hear those claims, it would decline to do so in the exercise of its discretion.

There are strong grounds for believing that Chalfant's federal claims and her pendent state claims do not share the same "nucleus of operative fact." *See PAAC v. Rizzo,* 502 F.2d 306, 312–13 (3d Cir. 1974). duPont's letter to the ALA, which forms the basis of Chalfant's state defamation claims (Count II of her Amended and Supplemental Complaint), is never mentioned in the detailed factual allegations pertaining to her federal claims (Count I). In

addition, duPont's letter to the ALA was not written until almost two years after Chalfant's dismissal.

Nevertheless, I would find it unnecessary to determine whether the district court had the *power* to determine Chalfant's pendent state claims, since I am convinced that it did not abuse its discretion in declining to do so. *Gibbs* states:

> It has consistently been recognized that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right. . . . Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. . . . Similarly, if it appears that the state issues substantially predominate, whether in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals.

383 U.S. at 726–27, 86 S.Ct. at 1139. *Gibbs* also counsels that the district court retains the discretionary authority to dismiss pendent state claims "throughout the litigation." *Id.* at 727, 86 S.Ct. 1130. *See also PAAC v. Rizzo, supra,* 502 F.2d at 312–13.

In this case, the district court recognized that the resolution of Chalfant's state defamation claims might require it to decide numerous unsettled questions of Delaware law. In defense to Chalfant's defamation claims, the defendants asserted several qualified privileges which have been accepted in other jurisdictions but which either have not yet been recognized or are not clearly delineated under Delaware law. 417 F.Supp. at 169; *see* Answering Post-Trial Brief of Defendants at 53–59. Given "the unsettled nature of state law" on these questions [25] and "[i]n light of the broad discretion which district courts must be giv-

for summary judgment. Such a showing however can be refuted by the defendant at trial, as happened *sub judice. See* 552 F.2d at 956 ("[b]ecause the burdens that may radiate from a decision upholding [a finding of state action]

may be potentially quite far-reaching, this issue should be dealt with in a full and thoughtful fashion").

25. *Moor v. County of Alameda,* 411 U.S. 693, 716, 93 S.Ct. 1785, 1799, 36 L.Ed.2d 596 (1973).

en in evaluating such matters," [26] I believe that the district court did not abuse its discretion in dismissing Chalfant's pendent state claims.[27]

In all respects therefore, I would affirm the judgment of the district court.

**26.** *Id.*

**27.** In light of my position on this issue, I do not consider the pendent state claims in the con-

text of *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976).