Samuel WENZER and Helen Wenzer

v.

**CONSOLIDATED RAIL CORPORATION
and R. T. Fox.**

Civ. A. No. 78–1264.

United States District Court,
E. D. Pennsylvania.

Jan. 25, 1979.

Joseph Lurie, Philadelphia, Pa., for plaintiffs.

John J. Runzer, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the Court are the motions of defendants Consolidated Rail Corporation ("Conrail") and R. T. Fox ("Fox") to dismiss for lack of jurisdiction over the subject matter, pursuant to Fed.R.Civ.P. 12(b)(1), and to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons stated below, the motions to dismiss for lack of jurisdiction over the subject matter will be granted as to Counts I and II of the amended complaint and the motions to dismiss for failure to state a claim upon which relief can be granted will be granted as to Counts III, IV, V and VI of the amended complaint (hereinafter referred to as "complaint").

Plaintiffs Samuel and Helen Wenzer ("the Wenzers") instituted the instant suit against Conrail, Mr. Wenzer's employer, and Fox, the Vice President and Treasurer of Conrail, alleging actionable injuries arising out of adjustments in Mr. Wenzer's employment status. Mr. Wenzer was employed in the position of "Assistant Director Damage Prevention," earning $28,544 per year, until May 9, 1977. During the first five months of 1977, various persons in Mr. Wenzer's department, including Mr. Wenzer himself, were being investigated for malfeasance. Based upon this course of investigation, several of Mr. Wenzer's co-workers and associates were discharged on grounds of malfeasance. On May 9, 1977, allegedly on the basis of the same investigation, Mr. Wenzer was placed on "surplus" status, which is a statutorily created position mandated by the employee protection provisions of the Regional Rail Reorganization Act of 1973. 45 U.S.C. § 701, *et seq.* (hereinafter referred to as "Rail Act of 1973"). While on surplus status, Mr. Wenzer was entitled to receive, and did receive, $21,744 per year and was not required to perform any services for Conrail.

After receiving these benefits for approximately nine months, Mr. Wenzer was reassigned to active status in a position paying $18,600 per year. Pursuant to the statutory

scheme, he received a "displacement allowance" sufficient to provide him with total compensation equal to the amount he received while on surplus status. *Id.,* at § 775(b). Thus, Mr. Wenzer earned $18,600 and was awarded an additional $3,174 per year.

The Wenzers brought suit in this Court, alleging jurisdiction under 28 U.S.C. §§ 1331 and 1337 and alleging diversity of citizenship and an amount in controversy in excess of $10,000, exclusive of costs and interest, pursuant to 28 U.S.C. § 1332(a). In Counts I and II of the complaint, the Wenzers allege that Mr. Wenzer is entitled to the highest position available commensurate with his ability and experience; that subchapter V of the Rail Act of 1973 imposes a duty upon Conrail to provide him with such a position; and, that an actionable breach of such duty occurred when Mr. Wenzer was placed on surplus status. In Counts III, IV and V, the Wenzers allege that Conrail is so closely identified with the United States Government that the acts of Conrail and its agents are to be considered "federal action" for the purposes of the First and Fifth Amendments. In Count III, the Wenzers allege that the defendants deprived Mr. Wenzer of his alleged statutory entitlement to the highest available position without due process of law, in violation of the Fifth Amendment. In Count IV, the Wenzers allege that the defendants deprived Mr. Wenzer of certain liberty interests in his good reputation by placing him on surplus status at the conclusion of the investigation, in violation of his Fifth Amendment right to due process of law. In Count V, the Wenzers allege that the defendants placed Mr. Wenzer on surplus status because of his association with certain disciplined co-workers and that, by doing so, they violated his rights of association as guaranteed by the First Amendment. In Count VI, the Wenzers allege that the actions of Conrail and Fox were intentional and wanton and caused extreme mental and emotional distress. By way of relief, the Wenzers demand money damages, as well as the reinstatement of Mr. Wenzer at the highest position available commensurate with his ability.

The defendants move to dismiss the statutory counts (Counts I and II) on the ground, *inter alia,* that the Court has no jurisdiction over the subject matter, because Congress created the exclusive remedy of arbitration for all disputes arising out of the employee protection scheme of the Rail Act of 1973. Secondly, defendants move to dismiss all counts for failure to state a claim upon which relief can be granted.

### Statutory Claims (Counts I and II)

The Rail Act of 1973 was enacted to effectuate the reorganization and consolidation of bankrupt railroads in the Midwest and Northeast and to help channel fresh capital into the system. 45 U.S.C. § 701(b). Title V of the Rail Act, which was codified as subchapter V, *Id.,* at § 771, *et seq.,* pertains to employee protection and is a comprehensive scheme to reduce the impact of the reorganization of the railroads on employees. S.Rep. No. 93–601, 93rd Cong., 1st Sess. (1973); 1973 U.S.Code Cong. & Admin.News, pp. 3242, 3258. The Wenzers claim that Mr. Wenzer is entitled to the highest level of employment available, commensurate with his abilities, pursuant to § 772 of Subchapter V. In opposition, the defendants argue that there is no statutory entitlement to such a position and that, in any event, this controversy is subject to the exclusive remedy of arbitration, as specified in § 775(i)(2), and that, therefore, this Court lacks subject matter jurisdiction to entertain plaintiffs' claims. The plaintiffs respond by arguing that § 775(i)(2) does not apply to this controversy and, even if it does, it is not mandatory.

It is well settled that, when Congress creates a right, it can establish an exclusive remedy for the enforcement of that right. *Tutun v. United States,* 270 U.S. 568, 579, 46 S.Ct. 425, 70 L.Ed. 738 (1926); *United States v. Babcock,* 250 U.S. 328, 331, 39 S.Ct. 464, 63 L.Ed. 1011 (1919). Expressed in other terms, the specification of one remedy as exclusive necessarily ex-

cludes another. *Switchmen's Union v. National Mediation Bd.*, 320 U.S. 297, 301, 64 S.Ct. 95, 88 L.Ed. 61 (1943). This principle was explained in *Renegotiation Board v. Bannercraft Clothing Co.*, 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1973), where the Supreme Court said:

It has been held that "where a statute creates a right and provides a special remedy, that remedy is exclusive." And "Congress for reasons of its own decided upon the method for the protection of the 'right' which it created. It selected the precise machinery and fashioned the tool which it deemed suited to that end. . . . "

*Id.*, at 18, 94 S.Ct. at 1037–1038 (citations omitted). Plaintiffs do not oppose this principle but only oppose its applicability to the facts of this case. The arbitration clause of Subchapter V provides:

If any dispute arises between the Corporation and a noncontract employee regarding the interpretation or application of *any provision of this subchapter*, the Corporation shall establish a resolution procedure with arbitration as the final step. Such resolution procedure shall be the *exclusive* means available to the parties for resolving such dispute, and any arbitration decision rendered shall be final and binding on all parties. Either party may request arbitration, and the cost and expenses of such arbitration shall be shared equally by the parties.

45 U.S.C. § 775(i)(2) (emphasis supplied). Plaintiffs argue that the language of § 775(i)(2) applies to some disputes, but not to all, and that disputes like the case at hand are in the category of disputes not subject to the section. The Court notes that Counts I and II allege a breach of Conrail's duty under 45 U.S.C. § 772(b). The Court also notes that § 772(b) is found within the same subchapter as the arbitration section. On the basis of the clear language of § 775(i)(2), we hold that a dispute arising out of § 772(b) is subject to the arbitration requirements of § 775(i)(2).

Plaintiffs argue, in the alternative, that the arbitration provision is neither manda-

tory nor exclusive, but is simply an alternate remedy to be chosen by the employee if he deems it advantageous. In support of this seeming circumvention of the plain language of the statute, plaintiffs cite a committee report which states:

Any disputes regarding the interpretation of these provisions *may* be submitted to arbitration and the costs of said arbitration shall be shared equally by the Carrier and the employee.

S.Rep. No. 94–499, 94th Cong. (1976); 1976 U.S.Code Cong. & Admin.News, pp. 14, 113. However, it is clear that this report refers to an amendment to the Rail Act of 1973, which is no longer in force in its original form. As originally enacted, the Rail Act of 1973 did not contain an arbitration provision in its employee protection plan. The Railroad Revitalization and Regulatory Act of 1976 was enacted on February 5, 1976, and amended the Rail Act of 1973 by adding the following language to § 775:

If any dispute arises between the Corporation and a noncontract employee regarding the interpretation or application of any provision of this title, the Corporation shall establish a resolution procedure with arbitration as the final step. Either party may request arbitration, and the cost and expenses of such arbitration shall be shared equally by the parties.

45 U.S.C. § 775(i)(2) (amended October 19, 1976). The language of this amendment, read in light of its legislative history as cited by the plaintiffs, would appear not to furnish a mandatory procedure. However, on October 19, 1976, Congress enacted the Rail Transportation Improvement Act of 1976, which amended § 775(i)(2) by adding, after the first sentence, the following language:

Such resolution procedure shall be the *exclusive* means available to the parties for resolving such dispute, and any arbitration decision rendered shall be *final and binding on all parties.*

Rail Transportation Improvement Act of 1976, P.L. 94–555, 90 Stat. 2623 (amending 45 U.S.C. § 775(i)(2) (emphasis supplied)). The legislative reports pertaining to this

amendment reinforce our conclusion that the remedy of arbitration is exclusive for all disputes arising out of the employee protection scheme. *See* S.Rep. No. 94–851, 94th Cong., 2nd Sess. (1976); 1976 U.S.Code Cong. & Admin.News, pp. 5837, 5865.

We hold, therefore, that, since plaintiffs have purported to allege a breach of a duty to promote under 45 U.S.C. § 771, *et seq.*, and since Congress has created an exclusive remedy for such a dispute, this Court has no subject matter jurisdiction over Counts I and II of the complaint.

*Constitutional Claims (Counts III, IV and V)*

█ The Wenzers allege that the actions of Conrail deprived Mr. Wenzer of certain property and liberty interests without due process of law as guaranteed by the Fifth Amendment, and that the same actions violated certain associational rights inherent in the First Amendment. To sustain these claims, it is axiomatic that the plaintiffs must show that the defendants' actions are the actions, in effect, of the federal government, since the First and Fifth Amendments only purport to restrict "federal action." *Public Utilities Com'n v. Pollak*, 343 U.S. 451, 72 S.Ct. 813, 96 L.Ed. 1068 (1952); *Junior Chamber of Commerce v. Missouri State Junior Chamber of Commerce*, 508 F.2d 1031 (5th Cir. 1975). To this end, the plaintiffs allege that "the federal government has so insinuated itself into a position of interdependence with Conrail" that the actions of Conrail and Fox are to be considered the acts of the federal government.

The Court notes that the plaintiffs are not alleging that the actions of Congress or of the federal government in general form the basis for their cause of action but, rather, that the personnel decisions of Conrail and Fox have deprived the Wenzers of their statutory and constitutional rights. Thus, the Court must determine whether the acts of the defendants are to be construed as being the acts of the federal government because of its extensive funding and regulation of Conrail.

The complaint alleges, in pertinent part, the following:

Conrail is a private for-profit corporation but its creation was mandated by Congress under the Regional Rail Reorganization Act, 45 U.C. 741 [*sic*]. Conrail is a highly regulated enterprise whose purpose is to serve the public and U.S. national needs. The establishment of Conrail and its continued existence is made possible by massive federal contributions and loans running into the hundreds of millions of dollars. On information and belief, the plaintiff alleges that more than 50% of Conrail's indebtedness is presently owed to the United States government and the Congress has authorized up to $350,000,000 of such loans. All "A" preferred stock in Conrail is owned by the U.S. Railway Association, a non-profit government corporation established under 45 USC 711 of the Act. Additionally, Congress has mandated an Employee Protection program under Title V of the Act, 45 USC 771 et seq. Under this Employee Protection program so-called "protected employees," such as the plaintiff, are entitled to displacement allowances, payments when they are placed in surplus or in positions paying less than their eligible displacement allowances. All displacement allowances are paid to protected employees, such as the plaintiff, by Conrail but Conrail is fully reimbursed out of the Treasure [*sic*] of the United States up to an aggregate of $250,000,000, 45 USC 779.

Complaint, ¶ 32.

█ The standards utilized to find federal action, necessary to sustain a claim under the Constitution, have been held to be identical to those employed to detect "state action." *Geneva-Towers Tenants Organization v. Federated Mortgage Investors*, 504 F.2d 483 (9th Cir. 1974). The Third Circuit recently outlined the analysis to be undertaken in determining whether the requisite state action is present in *Chalfont v. Wilmington Institute*, 574 F.2d 739 (3d Cir. 1978) (en banc). First, pursuant to the formulation articulated in *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 81

S.Ct. 856, 6 L.Ed.2d 45 (1974), we must determine whether the state has "so far insinuated itself into a position of interdependence with the [defendant] that it must be recognized as a joint participant in the challenged activity." *Id.*, at 725, 81 S.Ct. at 862. Then, if no state action is found, *Chalfont, supra*, at 746, the Court must examine the status of the defendant in light of the test formulated in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974), that:

> [State action will be found] whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.

*Id.*, at 351, 95 S.Ct. at 453. The plaintiffs argue that they have satisfied the federal action requirement under either formulation. We disagree and find that, reading the pleadings in light of the legislative facts, the plaintiffs have failed to state a claim upon which relief can be granted.[1]

■ In support of their claim that they have satisfied the *Burton* formulation, the plaintiffs seek to rely on *Chalfont* where the Third Circuit found "state action" in the policies and acts of a public library system. In reaching that conclusion, the court stressed that the system received 90% of its operating revenues from tax sources. *Chalfont, supra*, at 745. Local governmental entities which contributed to the funding were represented on the system's Board of Managers by local elected officials, who served on the Board in their *ex officio* capacities. *Id.* In addition, the system enjoyed tax-exempt status and employment contracts with library employees designated the employer as an agent of the government in furnishing public services. *Id.* Lastly, the organizational structure and management of the library was mandated by the state legislature and, most importantly, as in *Burton*, the library was located on City-owned property pursuant to a perpetual, rent-free lease. *Id.*

We find that the funding of Conrail by the United States Government through the purchase of Conrail securities by the United States Railway Association does not reach the level of "almost complete physical and financial interdependence" that existed between the "private" defendant and the state in *Burton*. *Hodge v. Paoli Memorial Hospital*, 433 F.Supp. 281 (E.D.Pa.1977). On the contrary, the involvement of the federal government in the case at bar is distinguishable on numerous grounds from the facts of *Chalfont*. Conrail, though it receives capital from the United States Railway Association, received capital in a totally different form than the yearly grants in *Chalfont*, and the funding does not reach the 90% level found in *Chalfont*. The financing of Conrail is in the form of "loans" and "investments" in Conrail debentures and Series A Preferred Stock. *See* 45 U.S.C. §§ 721(a), 726(a), (b). Interest is required on debt at the prevailing market rate or at the current yield rate of United States Railway Association Obligations, *Id.*, at § 721(c), and it is the stated policy of Congress that it intends to be repaid. *Id.*, at § 721(f). This policy is manifested by various reporting and auditing provisions. *See Id.*, at §§ 721(a), (b), 741(h). Furthermore, unlike the library in *Chalfont*, Conrail does not enjoy tax-exempt status but is a for-profit corporation formed under the laws of the Commonwealth of Pennsylvania. *Id.*, at § 741(b). In addition, Congress explicitly stated that Conrail "shall not be an agency or instrumentality of the Federal Government" in Conrail's implementing legislation. *Id.*

The plaintiffs argue that the representation of the United States Railway Association on the Board of Directors of Conrail brings Conrail under the control of the federal government. First, while it is true

---

1. The Court notes that, although the defendants filed various affidavits in support of their motions, the Court does not rely upon them in determining that the defendants' motions to dismiss for failure to state a claim upon which relief can be granted as to Counts III, IV and V and, therefore, the defendants' motions pursuant to Fed.R.Civ.P. 12(b)(6) are converted to motions for summary judgment, pursuant to Fed.R.Civ.P. 56.

that six of the thirteen Directors of Conrail are designated by the United States Railway Association, *Id.*, at § 741(d)(1)(A), this representation will be in effect only as long as the obligations of Conrail held by the Railway Association constitute 50% or more of Conrail's total indebtedness. *Id.*, at § 742. Second, unlike the *ex officio* board members in *Chalfont*, the six Directors serve on the Board of a for-profit corporation and owe a fiduciary duty, under the laws of the Commonwealth of Pennsylvania, to the corporation and shareholders. The Supreme Court recently examined the related question of whether conveyances of rail properties to Conrail in return for Conrail stock was an exercise of the power of eminent domain in the *Regional Rail Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). The Court found that it did not need to determine whether compensation in the form of securities would be sufficient as an exercise of the eminent domain power for several reasons:

> *First*, it is contended that despite the express provision of § 301(b) that Conrail "shall not be an agency or instrumentality of the Federal Government," 45 U.S.C. § 741(b) (1970 ed., Supp. III), federal participation through federally appointed members of the board of directors constitutes Conrail a federal instrumentality. From that premise the contention proceeds that the conveyance is an exercise of eminent domain. *But Conrail is not a federal instrumentality by reason of the federal representation on its board of directors. That representation was provided to protect the United States' important interest in assuring payment of the obligations guaranteed by the United States.* Full voting control of Conrail will shift to the shareholders if federal obligations fall below 50% of Conrail's indebtedness. The responsibilities of the federal directors are not different from those of the other directors—to operate Conrail at a profit for the benefit of its shareholders. Thus, Conrail will be basically a private, not a governmental, enterprise.

*Id.*, at 152; 95 S.Ct. at 363 (emphasis supplied) (footnote omitted).

In light of the nature and extent of the investment of the federal government in Conrail, the corporate nature of Conrail itself and the primarily private nature of its operations, we find that the acts of Conrail cannot be construed as being federal action under the *Burton* test.

The plaintiffs next contend that the acts of Conrail are federal action under the *Jackson* formulation. We must first determine whether Conrail is primarily private or public and, if private, apply the *Jackson* "nexus" test to determine if the entity is involved in state action. *Chalfont, supra,* at 746. In light of its primarily private function and its status as a for-profit corporation, we conclude that Conrail is primarily private. However, the relationship between the injury and the alleged governmental activity must be shown. Mere general regulation is not sufficient. *Jackson, supra,* 419 U.S. at 350, 95 S.Ct. 449; *Moose Lodge No. 107 v. Ervis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); *Broderick v. Associated Hospital Service of Philadelphia,* 536 F.2d 1 (3d Cir. 1976). There is no foundation or statutory basis for an allegation that the federal government "fostered or encouraged via statute, regulation or otherwise" Conrail's actions. *Hodge v. Paoli Memorial Hospital, supra,* at 283. The plaintiffs have not alleged that the federal government was involved, in any manner whatsoever, in the internal management processes of Conrail. "Significantly, there is no allegation that the government exercises control, attempts to exercise control, or otherwise intervenes" in such processes or policies. *Stearns v. Veterans of Foreign Wars,* 394 F.Supp. 138, 146 (D.D.C.1975), aff'd, 174 U.S.App.D.C. 78, 527 F.2d 1387 (1976), *cert. denied,* 429 U.S. 822, 97 S.Ct. 72, 50 L.Ed.2d 83 (1976). Accordingly, we find that, in light of the legislative facts, the plaintiffs have failed to state a claim upon which relief can be granted in Counts III, IV and V.

*Mental Distress (Count VI)*

In Count VI, the plaintiffs allege that the "wanton" acts of the defendants caused them severe mental and emotional distress. This tort has been recognized by the Pennsylvania Supreme Court, *Forster v. Manchester*, 410 Pa. 192, 189 A.2d 147 (1963), but liability has only been found where the conduct complained of is "so outrageous . . . so extreme in degree, as to go beyond all possible bounds of decency . . . ." *Jones v. Nissenbaum, Rudolph & Seidner*, 244 Pa.Super. 377, 368 A.2d 770 (1976), *citing* Restatement of Torts 2d, § 46, comment d. The acts of the defendant were fully justified statutorily, *see* 45 U.S.C. §§ 775(b), 771(6), 771(7), and do not rise to the level of the kind of extreme or outrageous conduct necessary to recover for infliction of mental distress. Accordingly, the defendants' motions to dismiss Count VI for failure to state a claim upon which relief can be granted, pursuant to Fed.R. Civ.P. 12(b)(6), will be granted. An appropriate Order will be entered.