Charles G. MARCUCCI, Plaintiff,

v.

NATIONAL RAILROAD PASSENGER CORPORATION, et al., Defendants.

No. 82 C 7980.

United States District Court, N.D. Illinois, E.D.

July 9, 1984.

---

**44.** Record at 12.

**45.** *Id.* at 13.

Barry A. Gomberg, Abrams, Gomberg & Reese, Ltd., David F. Addleton, Chicago, Ill., for plaintiff.

Mary E. Bennett, Lord, Bissell & Brook, Chicago, Ill., for Nat. R.R. Passenger Corp.

Roderick C. Dennehy, Jr., Deputy Gen. Counsel, Washington, D.C., C. Roy Peterson, Mary E. Bennett, Lord, Bissell & Brook, Chicago, Ill., pro hac vice for Nat. R.R. Passenger Corp. ("Amtrak") and each of the individual defendants.

## MEMORANDUM OPINION AND ORDER

DECKER, Senior District Judge.

Charles G. Marcucci (Marcucci) brought this five-count civil rights suit against the National Railroad Passenger Corporation (Amtrak) and twelve other individuals employed by Amtrak. The complaint alleges that defendants violated Marcucci's constitutional right to due process when they wrongfully discharged him from his job as a "trainmaster." The defendants move for summary judgment because, they argue, their conduct fails to qualify as "state action." The court agrees with defendants and enters judgment on the constitutional claims in the complaint.

### I. *Factual Background*

In February and March, 1981, the defendants, the Chicago Police Department, the Burlington Northern Railroad Security Department, and the Milwaukee Road Special Police conducted an investigation into the theft and resale of commuter railroad tickets. The investigation led to a series of interviews with Marcucci who, at that time, worked as a trainmaster with Amtrak.

Plaintiff alleges that, during these interviews, defendants denied him procedural rights guaranteed by the United States Constitution including his right to counsel and notice. On February 24, 1981, Marcucci prepared a written statement in which he admitted involvement in the resale of the tickets. Amtrak then discharged him on March 9, 1981.

The complaint contains five counts.[1] The first three counts allege violations of the fifth, sixth, and fourteenth amendments to the Constitution. Marcucci also claims violations of 42 U.S.C. § 1983.[2] The final two counts are pendent state counts that allege wrongful discharge and libel. Defendants move for judgment on the civil rights counts because Amtrak is a private body incapable of "state action."

### II. *Discussion*

On a motion for summary judgment, the moving party must clearly establish "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *Cedillo v. International Association of Bridge & Structural Iron Workers, Local Union No. 1*, 603 F.2d 7, 10–11 (7th Cir. 1979). The court must review "the entire record in the light most favorable to the opponent of the movant." *Id.* at 11.

Fed.R.Civ.P. 56(e) provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." When the adverse party fails to "so respond, summary judgment, if appropriate, shall be entered against him." *Id.*

The fifth, sixth, and fourteenth amendments only protect Marcucci from actions taken by the federal or state government.

---

1. Although Marcucci numbered the counts I through VI, the complaint lacks a count III.

2. The court cannot understand these allegations because Marcucci fails to allege that defendants acted on behalf of the state. At most, they were federal government employees. Since section 1983 applies only to conduct on behalf of a state, the court dismisses all claims filed under section 1983.

*E.g., Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972); *Wenzer v. Consolidated Rail Corporation,* 464 F.Supp. 643, 647 (E.D.Pa.), *aff'd,* 612 F.2d 576 (3rd Cir.1979). The fourteenth amendment "'erects no shield against merely private conduct, however discriminatory or wrongful.'" *Blum v. Yaretsky,* 457 U.S. 991, 1002, 102 S.Ct. 2777, 2784, 73 L.Ed.2d 534 (1982) (quoting *Shelley v. Kraemer,* 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948)). In determining whether conduct is action by the federal government, the court must apply the same standard as applied in determining whether conduct is action by a state. *Wenzer,* 464 F.Supp. at 647.

The United States Supreme Court articulated what constitutes state action in *Blum v. Yaretsky,* 457 U.S. at 1004, 102 S.Ct. at 2785, and *Rendell-Baker v. Kohn,* 457 U.S. 830, 839–43, 102 S.Ct. 2764, 2770–72, 73 L.Ed.2d 418 (1982). In *Blum,* the Court held that decisions made by private physicians about transferring nursing home patients were not actions by the state. 457 U.S. at 1005–12, 102 S.Ct. at 2786–89. Government Medicaid regulations established the standards and procedures for transfer. *Id.* at 1005–12, 102 S.Ct. at 2786–89.

To establish state action, "[t]he complaining party must ... show that 'there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.'" 457 U.S. at 1004, 102 S.Ct. at 2785 (quoting *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 350, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974)). "The purpose of this requirement is to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Id.* (emphasis in original).

*Rendell-Baker* reiterated that the state action doctrine requires a causal connection between the state involvement and the alleged deprivation. The plaintiffs, who were teachers, challenged their discharges by a state-supported school. The school allegedly based the discharges on the teachers' exercise of their first amendment rights. The school received 90% of its funds from state and federal agencies. The Court concluded that state funding was insufficient to establish the "nexus between the State and the challenged action." *Compare* 457 U.S. at 841–42, 102 S.Ct. at 2771–72 *with id.* 457 U.S. at 1004, 102 S.Ct. at 2785. The Court quoted the observation in *Blum* that "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* 457 U.S. at 840, 102 S.Ct. at 2771 (quoting *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785). "[T]he decisions to discharge the [teachers] ... were not compelled or even influenced by any state regulation." *Id.* 457 U.S. at 841, 102 S.Ct. at 2771.

Applying these standards to Marcucci, the court must first examine the relationship between Amtrak and the federal government. The Rail Passenger Act of 1970, 45 U.S.C. § 501, *et seq.,* created Amtrak to make railway travel more efficient. 45 U.S.C. § 501. Congress created "a for profit corporation, the purpose of which shall be to provide intercity rail passenger service." *Id.* at § 541. Congress stated that the corporation was not "an agency or establishment of the United States government." [3] *Id.* The United States plays an

---

**3.** Amtrak, as well as courts facing situations similar to Marcucci's, place great emphasis on that portion of section 541 that states how Amtrak is "not an agency or establishment of the United States government." This provision sheds little light on the state action issue. If federal government involvement with Amtrak resulted in constitutional deprivations, a congressional attempt to disavow the involvement could hardly insulate it from the Constitution. Under *Blum* and *Rendell-Baker,* courts should look at the relationship between the particular constitutional deprivation and the nature of federal regulation. If the regulation generates the deprivation, congressional intent to insulate itself from the private instrumentality of the dep-

active role in Amtrak's operation. *E.g.,* 45 U.S.C. § 543 (providing for eight of fifteen directors to be appointed by the President); § 548 (requiring monthly reports to Congress); §§ 601–02 (authorizing appropriations).

*Blum* and *Rendell-Baker,* however, require that the court probe deeper to determine whether the government's involvement is so closely connected with the alleged unconstitutional acts that the government is responsible for the acts. *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2785, *Rendell-Baker,* 457 U.S. at 841, 102 S.Ct. at 2772. The record in this case lacks any evidence that federal regulations or funding resulted in the procedures that Amtrak used when it disciplined Marcucci. In fact, section 546(b) provides:

> The Corporation shall be subject to the same laws and regulations with respect to safety and with respect to the representation of its employees for purposes of collective bargaining, the handling of disputes between carriers and their employees, employee retirement, annuity and unemployment systems, and other dealings with its employees as any other

common carrier subject to part I of the Interstate Commerce Act.

45 U.S.C. § 546(b). This section evidences that Amtrak employees have the same status as employees of any other private employer. Therefore, employee relations, in general, and Amtrak's conduct with respect to Marcucci, in particular, are independent of the federal government. Federal action was not responsible for Marcucci's termination.

In response to this challenge, Marcucci elaborated the intimate relationship between Amtrak and the federal government. The court recognizes the many regulatory and financial ties between Amtrak and the federal government. None of the facts cited by Marcucci, however, indicate that federal policies caused the conduct about which Marcucci complains.[4] Although federal officials set goals and general policies, Marcucci cites no regulation or policy that could have caused the conduct described in the complaint. Without any evidence of such a "nexus," no genuine issue of fact exists on the material issue of whether there is state action.[5] This conclusion is

rivation is irrelevant. Therefore, this court rests its holding on an analysis of Marcucci's claim and not the content of section 541. If Congress chooses to become involved in disciplinary policies at Amtrak, personnel decisions at Amtrak could become state action.

**4.** Plaintiff contends that, because Amtrak is subject to the Freedom of Information Act, 5 U.S.C. § 552, the court must treat it as a government agency. Memorandum in Opposition to Summary Judgment at 6. Congress amended the Freedom of Information Act in 1974 in part to ensure that Amtrak fell within its scope. In making the amendments, Congress observed that an expanded definition of agency was necessary because corporations like Amtrak might "not [otherwise] be considered agencies [under the Freedom of Information Act]." H.R.Rep. No. 876, 93d Cong., 2d Sess. 8 *reprinted in* 1974 U.S.Code Cong. & Ad.News 6267, 6274.

Although the Freedom of Information Act uses the term "agency," it does not mean that those institutions within its scope are agents of the federal government for all purposes. That Amtrak is subject to the act reflects nothing about the federal government's responsibility for Marcucci's termination. The same power that entitled Congress to create Amtrak entitles it to

regulate Amtrak. Making Amtrak subject to the Freedom of Information Act is an example of congressional regulation that does not necessarily convert all the institution's actions into federal actions. *See Blum,* 457 U.S. at 1005–12, 102 S.Ct. at 2786–89.

**5.** Marcucci relies on *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), and argues that Amtrak and the federal government have a "symbiotic relationship" as did the parking garage and the state in *Burton.* In that case, the Supreme Court found state action where a state supported a public parking garage that housed an allegedly discriminatory restaurant. The state, therefore, indirectly benefited from the restaurant. Because the parking garage and the state were in a "symbiotic relationship," the restaurant's discrimination was state action. *Id.* at 721–26, 81 S.Ct. at 859–62.

*Blum* and *Rendell-Baker* explained the scope of "symbiotic relationship." *Rendell-Baker* observed that "the Court [in *Burton*] concluded that [the increased profits due to discrimination] showed that the State profited from the restaurant's discriminatory conduct." 457 U.S. at 843, 102 S.Ct. at 2772. In neither *Rendell-Baker* nor *Blum* could the court reach a similar

consistent with other judicial opinions involving personnel decisions by Amtrak. *See, e.g., Anderson v. National Railroad Passenger Corporation,* No. 83 C 51, slip op. (N.D.Ill. August 30, 1983) (Judge Grady) (finding no state action); *Kimbrough v. National Railroad Passenger Corporation,* 549 F.Supp. 169, 172–73 (M.D.Ala. 1982) (same).

### Pendent State Claims

The court dismisses counts V and VI. Because they are state law counts over which the court does not have diversity of citizenship jurisdiction,[6] the court only has jurisdiction over them as claims pendent to a federal claim. *See Gibbs v. United Mine Workers,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The court grants judgment on the federal counts at so early a stage that it resists asserting its pendent jurisdiction over counts V and VI. *Gibbs,* 383 U.S. at 726, 86 S.Ct. at 1139 ("[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right.").

Even if the federal count had survived, however, the court would still dismiss the state counts. *Gibbs* counseled restraint in the exercise of pendent jurisdiction "if it appears that the state issues substantially predominate." 383 U.S. 726–27, 86 S.Ct. at 1139. The allegations of the complaint convince the court that this is a state-law wrongful discharge suit riding into federal court on the back of three due process claims. The state law claims belong in the state court whatever the disposition of the constitutional claims.

### III. *Conclusion*

For the reasons above, the court enters judgment for defendants on counts I, II, and IV and dismisses counts V and VI without prejudice.

---

conclusion. *Blum,* 457 U.S. at 842–43, 102 S.Ct. at 2772. Likewise, nothing in the record before this court indicates that the United States benefited from the alleged impropriety in this case. Plaintiff also asserts that Amtrak has a monopoly over intercity rail passenger service and, therefore, performs a "public function." To qualify as a public function, a corporation's operation must have been "'traditionally the *exclusive* prerogative of the State'" *Rendell-Baker,* 457 U.S. at 842, 102 S.Ct. at 2772 (emphasis in original) (quoting *Jackson v. Metropolitan*

*Edison Co.,* 419 U.S. 345, 353, 95 S.Ct. 449, 454, 42 L.Ed.2d 477 (1974)). Before 1970, intercity rail passenger service was not the exclusive prerogative of the federal government. Therefore, Amtrak does not now do what the government did before 1970; it does not act in place of the federal government.

**6.** Whatever Amtrak's citizenship might be, the individual defendants' Illinois citizenship destroys complete diversity. *See Strawbridge v. Curtiss,* 7 U.S. 267, 2 L.Ed. 435 (1806).