**Joel MYRON, Plaintiff-Appellant,**

v.

**CONSOLIDATED RAIL CORPORATION, Defendant-Appellee.**

**No. 359, Docket 84–7524.**

United States Court of Appeals, Second Circuit.

Argued Oct. 29, 1984.

Decided Jan. 8, 1985.

Joel Myron, Jersey City, N.J. (Hall, Clifton & Schwartz, New York City, of counsel), for plaintiff-appellant.

Robert W. Smith, Philadelphia, Pa. (Morgan, Lewis & Bockius, Dennis J. Morikawa, Cary Alan Metz, Philadelphia, Pa., of counsel), for defendant-appellee.

Before FEINBERG, Chief Judge, and MANSFIELD and MESKILL, Circuit Judges.

FEINBERG, Chief Judge:

Joel Myron appeals from an order of the United States District Court for the Southern District of New York, John E. Sprizzo, J., granting a motion for summary judgment by defendant-appellee Consolidated Rail Corporation (Conrail). Conrail had discharged Myron for disloyalty. In accordance with the Railway Labor Act, 45 U.S.C. § 153 First (i), Myron petitioned the National Railroad Adjustment Board, Third Division (the Board), which sustained the discharge. On appeal from the judgment of the district court, Myron contends that the Board's decision violated the Railway Labor Act, and that Conrail violated his First and Fifth Amendment rights by discharging him.[1]

We affirm the judgment of the district court.

## I.

Briefly stated, the undisputed facts are as follows. Prior to April 1, 1976, Myron was an employee in the track department of the Lehigh Valley Railroad Company. On that date, he became an employee of Conrail when, pursuant to the Regional Rail Reorganization Act, 45 U.S.C. § 701 et seq., Conrail acquired Lehigh Valley's operations. While working for Lehigh Valley,

---

1. Myron also asserts that Conrail violated his Fourteenth Amendment rights. As appellee correctly points out, Myron alleges only "federal" action in this case. The Fourteenth Amendment is therefore inapplicable.

Myron attended law school and received his law degree. In January 1977, he was admitted to the New Jersey bar. While with Conrail, Myron served as "Local Chairman" of Lodge 705, Brotherhood of Maintenance of Way Employees (the Union), which represented him and his fellow employees for the purposes of collective bargaining.

In the fall of 1978, Myron represented Robert J. Jacques in the state courts of New Jersey in a civil action growing out of Conrail's discharge of Jacques. In November 1978, Myron entered into a "limited partnership" agreement with Lonny Hirsch. The law firm of Hirsch & Myron represented several Conrail employees in Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 et seq., actions against Conrail, although Myron claims to have played no role in those actions.

In December 1978, pursuant to the applicable collective bargaining agreement, Conrail charged Myron with various acts of disloyalty. In particular, it charged that both his representation of Jacques and his partnership with Hirsch violated company rules providing that "[a]ny act of hostility or willful disregard of the company's interest will not be condoned." Such a rule apparently was permissible under the collective bargaining agreement. After an investigatory hearing in early 1979, Myron was discharged for disloyalty. The discharge was sustained through each stage of the grievance procedure mandated by the collective bargaining agreement.

Myron then petitioned the Board, seeking reinstatement with full back pay. The Board sustained the discharge on both grounds advanced by Conrail, and Myron sought review in the district court. In an oral opinion after argument, Judge Sprizzo granted Conrail's motion for summary judgment, declining to overturn the Board's decision. This appeal followed.

## II.

At the outset, we note that our scope of review is extremely limited. See *Union Pacific Railroad Co. v. Sheehan*, 439 U.S. 89, 99 S.Ct. 399, 58 L.Ed.2d 354 (1978); *Skidmore v. Consolidated Rail Corp.*, 619 F.2d 157 (2d Cir.1979), *cert. denied*, 449 U.S. 854, 101 S.Ct. 148, 66 L.Ed.2d 488 (1980). The Railway Labor Act, 45 U.S.C. § 153 First (q), while providing for judicial review of Board decisions, states that

> [o]n such review, the findings and order of the division shall be conclusive on the parties, except that the order of the division may be set aside, in whole or in part, or remanded to the division, for failure of the division to comply with the requirements of this chapter, for failure of the order to conform, or confine itself, to matters within the scope of the division's jurisdiction, or for fraud or corruption by a member of the division making the order.

■ Appellant acknowledges this narrow standard of review, but nonetheless claims that he is entitled to relief. In essence, he argues as follows: the Union has a right under the Railway Labor Act to organize itself without interference from the carrier (in this case Conrail), see 45 U.S.C. § 152 Fourth, as well as a right under the Constitution to "employ counsel to represent its members," see *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576, 581, 91 S.Ct. 1076, 1080, 28 L.Ed.2d 339 (1971); *Brotherhood of Railroad Trainmen v. Virginia ex rel. Virginia State Bar*, 377 U.S. 1, 5–8, 84 S.Ct. 1113, 1116–1118, 12 L.Ed.2d 89 (1964); by barring the Union from employing counsel of its choosing, Myron's discharge interfered with the Union's right to organize as it sees fit; therefore, the Board's decision upholding the discharge was not in compliance with the provisions of the Railway Labor Act.

Myron's argument fails on at least two grounds. First, the rights that he describes are the rights to organize and bargain collectively with the employer, which arise under the Railway Labor Act, and the rights of unions and their members to obtain legal advice and to hire their own attorneys. The cases Myron cites do not suggest that either a union or its membership has any right to be represented by a

particular attorney (who is currently working for the same employer). Furthermore, Conrail's discharge of appellant does not preclude him from continuing to represent the Union or its members in legal matters.

Second, the Board found that Myron was not acting under the Railway Labor Act as a union representative on behalf of a fellow employee in the suit against Conrail. We have no basis for overturning that finding of fact. In representing Jacques in the state courts, Myron simply acted as an attorney. In that capacity, as Judge Sprizzo pointed out, Myron assumed "the professional obligations [of] a lawyer," and his status was "dependent upon a whole set of rules and obligations and standards which are totally unrelated to and indeed have no relationship to [Myron's] status as a union representative." The Board noted that as a private attorney for Jacques, Myron was not "clothed with ... the immunities" that might otherwise be his as a union representative. In short, there is no evidence that Conrail interfered with the Union's right to organize as it sees fit; the Board's decision conformed with the provisions of the Railway Labor Act.

Myron also makes the related argument that in discussing the claims raised by Myron on behalf of Jacques in the state courts, the Board went beyond the scope of its jurisdiction by ruling that the Railway Labor Act "does not deal with" tort claims. The Board, however, held that the Railway Labor Act did not protect Myron because he was not acting in his capacity as a union representative at that time. The Board justifiably noted that the papers filed for Jacques in the New Jersey courts stated that the cause of action was "separate and apart from the Union." Myron's reliance on tort theories in taking the appeal was seen principally as further evidence supporting the Board's finding that he was acting as a private attorney. In any event, the Board surely did not exceed its jurisdiction in holding that Myron was not protected by the Railway Labor Act when he acted as attorney for Jacques in the state court lawsuit.

Before leaving this subject, we note that Myron was discharged not only for his representation of Jacques but also because of his affiliation with a law firm, Hirsch & Myron, that represented several of Myron's fellow employees with FELA claims against Conrail. On appeal, Myron has largely ignored this second ground for dismissal. Before the Board (and the district court), however, Myron claimed that he was a "limited partner" of Hirsch and did not share in fees received from prosecution of FELA claims against Conrail. The Board nonetheless upheld Conrail's decision, apparently finding that Myron held himself out as a general partner by not indicating his limited status on his letterhead and by allowing the firm's letters to Conrail to state that the FELA claims were being handled by "our firm."

We understand that this conduct might be viewed as "disloyalty"—it could attract Conrail employees with potential FELA claims to come to Myron's office rather than do nothing, under the assumption that he would have a special interest in their claims. Nevertheless, we take this opportunity to express our concern over the Board's apparent failure to consider the policies underlying the FELA in passing on Myron's discharge. In particular, the Board should consider in this type of case whether the federal policy underlying the FELA favoring tort suits against covered employers prohibits discharge based on the sole ground that the discharged employee assisted a fellow employee in prosecuting an FELA claim. We recognize that several courts have held that the FELA creates no private right of action for employees alleging that they were discharged in retaliation for bringing FELA claims against their employer. See *Lanfried v. Terminal Railroad Ass'n*, 721 F.2d 254 (8th Cir.1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1712, 80 L.Ed.2d 185 (1984); *Jackson v. Consolidated Rail Corp.*, 717 F.2d 1045 (7th Cir. 1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 1000, 79 L.Ed.2d 233 (1984); *Bay v. Western Pacific Railroad Co.*, 595 F.2d 514 (9th Cir.1979). Without expressing a view as to the correctness of those decisions, we believe that they do not bar the Board from finding retaliatory discharge contrary to the policies underlying the FELA. And if

discharge for bringing a suit is impermissible, discharge for assisting with the suit might be impermissible as well. Cf. 45 U.S.C. § 60 (making it a crime to discipline employee for voluntarily furnishing information in connection with an FELA case).

### III.

Myron makes the separate claim that Conrail violated his First and Fifth Amendment rights by discharging him for representing various people with interests adverse to Conrail. To sustain these claims, Myron must show that Conrail's actions were effectively the actions of the federal government, since the First and Fifth Amendments restrain "federal action," not action taken by a private employer. *Public Utilities Comm'n v. Pollak,* 343 U.S. 451, 461, 72 S.Ct. 813, 820, 96 L.Ed. 1068 (1952). In examining allegations of "federal action" we have employed the same standards applicable in "state action" cases. *See, e.g., Holodnak v. Avco Corp.,* 514 F.2d 285 (2d Cir.), *cert. denied,* 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975); *see also, Geneva Towers Tenants Organization v. Federated Mortgage Investors,* 504 F.2d 483, 487 (9th Cir.1974).

To fairly attribute to the federal government Conrail's decision to discharge Myron, we must find either that "there is a sufficiently close nexus between the [government] and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the [government] itself," *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974) (citing *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 176, 92 S.Ct. 1965, 1973, 32 L.Ed.2d 627 (1972)), or that even if the particular act is not directly attributable to the government, the government "so far insinuated itself into a position of interdependence with [Conrail] that it was a joint participant in the enterprise," *Jackson, supra,* 419 U.S. at 357–58, 95 S.Ct. at 456–57 (citing *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 725, 81 S.Ct. 856, 861, 6 L.Ed.2d 45 (1961)). Here, there is no allegation that the decision to discharge Myron was "compelled or even influenced by any [federal] regulation." *See Rendell-Baker v. Kohn,* 457 U.S. 830, 841, 102 S.Ct. 2764, 2772, 73 L.Ed.2d 418 (1982). As in *Wenzer v. Consolidated Rail Corp.,* 464 F.Supp. 643 (E.D.Pa.), aff'd mem., 612 F.2d 576 (3d Cir.1979), Myron has "not alleged that the federal government was involved, in any manner whatsoever, in the internal management processes of Conrail." *Id.* at 649.

Our focus, therefore, must be on Myron's claim that the federal government has so "insinuated itself into a position of interdependence" with Conrail that it must be considered a joint participant in Conrail's operations. See *Burton, supra,* 365 U.S. at 725, 81 S.Ct. at 861. In stating his case, Myron relies on the following factual assertions, which we assume to be true in reviewing the entry of summary judgment on behalf of Conrail: Conrail's creation was mandated by act of Congress, *see* Regional Rail Reorganization Act, 45 U.S.C. § 741 et seq.; Conrail relies heavily on federal funds; the federal government not only regulates Conrail extensively but also monitors its financial performance through the United States Railway Association, see id. § 711 et seq.; the federal government, again through the United States Railway Association, owns 85% of Conrail's preferred stock; six of the thirteen members of Conrail's board of directors represent the federal government, see id. § 741(d)(1)(A); and finally, in 1981 Congress passed an act directing the sale of Conrail's properties and operations, irrespective of the wishes of Conrail management, see 45 U.S.C. § 761 et seq.

Myron concedes that substantial federal funding, even when coupled with extensive regulation, is not enough to make the action of an essentially private enterprise "federal action." *See, e.g., Blum v. Yaretsky,* 457 U.S. 991, 1010–11, 102 S.Ct. 2777, 2788–89, 73 L.Ed.2d 534 (1982). We are persuaded that despite considerable federal involvement, Conrail is basically a private enterprise. Shortly after Conrail was created, the Supreme Court considered whether forced conveyances of rail properties to Conrail in exchange for Conrail stock amounted to an exercise of the power of eminent domain. *See Regional Rail Reor-*

*ganization Act Cases,* 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974). The Court concluded it was not, in part because Conrail is not a governmental enterprise:

> *First,* it is contended that despite the express provision of § 301(b) that Conrail "shall not be an agency or instrumentality of the Federal Government," 45 U.S.C. § 741(b) (1970 ed., Supp. III), federal participation through federally appointed members of the board of directors constitutes Conrail a federal instrumentality. From that premise the contention proceeds that the conveyance is an exercise of eminent domain. But Conrail is not a federal instrumentality by reason of the federal representation on its board of directors. That representation was provided to protect the United States' important interest in assuring payment of the obligations guaranteed by the United States. Full voting control of Conrail will shift to the shareholders if federal obligations fall below 50% of Conrail's indebtedness. The responsibilities of the federal directors are not different from those of the other directors—to operate Conrail at a profit for the benefit of its shareholders. Thus, Conrail will be basically a private, not a governmental, enterprise.

*Id.* at 152, 95 S.Ct. at 363 (footnote omitted).

In *Wenzer, supra,* on facts similar to ours, the district court held that Conrail's action in adjusting the plaintiff's employment status did not constitute federal action. 464 F.Supp. at 647–49. Judge Sprizzo, below, found the reasoning in *Wenzer* persuasive, as do we. Conrail is a for-profit corporation established under the laws of Pennsylvania. 45 U.S.C. § 741(b). Moreover,

> [t]he financing of Conrail is in the form of "loans" and "investments" in Conrail debentures and Series A Preferred Stock. *See* 45 U.S.C. §§ 721(a), 726(a), (b). Interest is required on debt at the prevailing market rate or at the current yield rate of United States Railway Association Obligations, *Id.,* at § 721(c), and it is the stated policy of Congress that it intends to be repaid. *Id.,* at § 721(f).

*Wenzer, supra,* 464 F.Supp. at 648. In addition, as the Supreme Court noted in *Regional Rail Reorganization Act Cases, supra,* 419 U.S. at 152, 95 S.Ct. at 363, the federal representatives on the board of directors owe a fiduciary duty, under state law, to the corporation and shareholders. See also *Wenzer, supra,* 464 F.Supp. at 649. Myron claims that *Wenzer* is distinguishable because after that case was decided Congress, in effect, put Conrail up for sale. But Congress' power to direct that Conrail be sold does not affect Conrail's essentially nongovernmental nature.

Myron contends that his case is controlled by *Holodnak v. Avco Corp.,* 514 F.2d 285 (2d Cir.), *cert. denied,* 423 U.S. 892, 96 S.Ct. 188, 46 L.Ed.2d 123 (1975). In *Holodnak,* a defense contractor discharged an employee for publishing an article critical of both his employer and his union. The federal government owned the land on which the employer's defense contracting facility was located (for which the employer paid no rent), as well as the buildings and most of the machinery and equipment used in the manufacturing process. Moreover, "a substantial government 'task force' maintained at the plant undertook to assure contract compliance, to guarantee control of product quality, and to audit the accounting activities of the ... facility." *Id.* at 289. Consequently, this Court found that the government had " 'so far insinuated itself into a position of interdependence with [Avco] that it must be recognized as a joint participant.' " *Id.* (quoting *Burton, supra,* 365 U.S. at 725, 81 S.Ct. at 862). *Holodnak,* though not unlike the case before us, is distinguishable. There, the government not only owned outright most of the means of production but also, with its significant in-plant presence, apparently exercised meaningful control over Avco's operations; it could fairly be considered a joint participant in the enterprise. Here, despite federal funding, regulation, stock ownership and representation on the board of directors, there is nothing resembling federal supervision of day-to-day activities. In sum, we conclude that despite an obviously close relationship, the federal government has not "so far insinuated itself into a

position of interdependence" with Conrail that the latter's personnel decisions can be considered federal action.[2]

The judgment of the district court is affirmed.

MESKILL, Circuit Judge, concurring:

I concur in the result reached and in all of Chief Judge Feinberg's reasoning with the exception of the last two paragraphs of section II, which I believe to be a dispensable combination of dicta and advisory opinion.

---

2. Because we find that Conrail's action in discharging Myron was not federal action, we need not address the merits of Myron's constitutional claims.